**Opinion issued May 2, 2017**



**In The**

# Court of Appeals

**For The**

# First District of Texas

_____

**NO. 01-16-00119-CR**

_____

**DEREK THOMAS BALDIT, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the County Criminal Court at Law No. 7**
**Harris County, Texas**
**Trial Court Case No. 2006621**

---

## O P I N I O N

A jury convicted appellant, Derek Thomas Baldit, of the Class A

misdemeanor offense of assault on a family member.[1]  Pursuant to an agreement

---

[1]     *See* TEX. PENAL CODE ANN. § 22.01(a)(1) (West Supp. 2016).

between appellant and the State, the trial court assessed appellant's punishment at 180 days' confinement in the Harris County Jail. In two issues, appellant contends that (1) the State failed to present sufficient evidence that he intentionally or knowingly caused bodily injury to the complainant and (2) the trial court erred in failing to make a competency finding concerning a child witness.

We affirm.

## Background

In January 2015, Laurita Elvir, the complainant, and appellant had been dating for approximately two years, and they were engaged. Elvir and her daughter, D.G., who was five years old at the time, lived with appellant in a house in Katy, Texas.

On January 27, 2015, Elvir and appellant began arguing while he was getting dressed in an upstairs bedroom. Appellant walked downstairs and into the kitchen, where he opened the refrigerator, and Elvir followed him, "still expressing how [she] felt." Elvir testified that she "said something that set [appellant] off," and he slammed the refrigerator door shut and gave her an angry look. Appellant rushed towards her and pushed her "really hard" against the door to a coat closet and held her there with his hand on her neck. Elvir's back hit the door, and she stated that she was scared because appellant had been violent with her before and she did not know what he was going to do next.

2

Elvir told appellant that she was going to call the police, and she went into the living room, where D.G. was sitting on the couch watching television, to retrieve her cell phone. Elvir started to unlock her phone, but appellant followed her and tried to grab the phone from her. Both appellant and Elvir were holding onto her phone, and Elvir stated that she held on tightly because appellant was trying to take the phone away from her. She testified, "I got pushed off to the ground on the floor and I'm being dragged from the living room, you know, hitting different things throughout the little hallway we have there into the kitchen and still holding onto [the phone]." She continued to hold onto her phone because she was scared, she wanted to call the police, and she did not have a landline.

Elvir testified that appellant tried to take her phone away while she was holding onto it, and she was "being dragged on the floor just hitting different things," including closet doors, the island in the kitchen, the couch, the television stand, a table in the living room, and the walls. Elvir had carpet burns on her face, elbow, and back as a result of being dragged around the house. Elvir was yelling and screaming while this was happening, and she repeatedly yelled at appellant to stop and give her the phone. D.G. was also screaming and crying during this time.

Eventually, appellant took Elvir's phone away from her. He started to leave the house with her phone, so Elvir grabbed onto his leg. Appellant did not kick her or throw her off, but he was able to get free, and he left the house. Appellant walked

outside to the garage, locked the door to the garage so Elvir could not follow him in there, placed her phone in the garage, and then drove away. A neighbor overheard Elvir crying in her driveway, asked if she was alright, and called 911. Elvir later recovered her phone from the garage.

In addition to the carpet burns that she received, Elvir's injuries also included a broken toenail, which broke and bled when she bumped into various objects in the house. Elvir had bruising around her eye and on her back, her elbow, her hands, and her forearm. She stated that she had intense pain in her right forearm because she was gripping her phone very tightly with her right hand. She was not sure if her arm was broken, and she had difficulty writing immediately after this incident. Elvir testified that she bumped into several different objects in the house, and she was not sure which one caused each specific injury.

D.G., who was six years old and in kindergarten at the time of trial, also testified. D.G. testified that she knows the difference between the truth and a lie, and she was able to demonstrate this when the prosecutor asked her if he had a funny shoe on his head. She stated that would be a lie "[b]ecause there is no shoe on [his] head." When asked what was on the prosecutor's head, she replied, "your hair," and she agreed that that would be the truth. She also agreed that it is important to tell the truth, and she promised "just to tell the truth while [she is] in the courtroom today."

4

D.G. testified that one year before, she lived "in Katy at the apartment" with her mother "and somebody else." She remembered a time when her mother "and the other person" got into a fight. She testified that while she was on the couch watching cartoons, Elvir and appellant started loudly "fighting and saying stuff" upstairs. When they came downstairs, appellant pushed Elvir hard into the closet door. Elvir said that she was going to call the police and ran for her phone, but appellant also got to the phone and they started struggling. D.G. stated that Elvir held tightly onto the phone and that Elvir also held onto appellant's leg while he "dragged her around the whole carpet on the floor." She testified that appellant went outside once he got ahold of Elvir's phone and that he put the phone in the garage. She stated that Elvir screamed and cried a lot, and she thought that appellant hurt Elvir. She also stated that Elvir "had bruising all over her and her toe was kind of cracked open."

On cross-examination, D.G. agreed that Elvir talked to her about testifying the week of trial and the week prior to trial. She also agreed with defense counsel's statement that Elvir "talked to [her] about what [she] was going to say."

On redirect examination, the prosecutor asked D.G. if Elvir told her to tell the truth, and D.G. responded "yes." She also agreed that Elvir told her that it was okay if she did not remember something, and she once again agreed that it is always important to tell the truth.

5

Deputy P. Gonzales, with the Harris County Constable's Office, responded to the 911 call. Deputy Gonzales testified that when he arrived at the house, Elvir was crying, her voice was trembling, "and she had signs of being recently in an abusive situation." Elvir had blood on the side of her face, she had difficulty moving her arm, and one of her toenails had flipped backwards into an upright position. Deputy Gonzales contacted appellant and asked him to return to the scene, which he did. Appellant agreed that he got into an argument with Elvir, but he told Deputy Gonzales that Elvir hit him, and when he tried to walk out of the house, Elvir grabbed onto his leg, which was probably how she hurt herself. Deputy Gonzales did not see any injuries on appellant. He considered Elvir's account of events to be credible and not appellant's account.[2]

Appellant's father, Roy Baldit, testified on his behalf. Roy testified that he saw appellant after he was released from jail the day after the incident with Elvir. He stated that appellant had what looked like scratch marks or fingernail marks on his neck, his back, and his arms. Roy took pictures of these scratches, and the trial court admitted them into evidence. Roy stated that appellant's booking photograph, which had also been admitted into evidence, showed marks on appellant's neck

---

[2] Deputy Gonzales testified that he did not recall Elvir telling him anything about her phone, but he clarified that she mentioned the struggle over her phone in her written statement taken later. He testified that another deputy had to write the statement for Elvir because her arm was injured and she could not write.

consistent with the ones that he saw, and the marks in that photograph looked "fresher" than the marks when he saw appellant.

The jury found appellant guilty of assault of a family member. Pursuant to an agreement between appellant and the State, the trial court assessed appellant's punishment at 180 days' confinement in the Harris County Jail. This appeal followed.

## Sufficiency of Evidence

In his first issue, appellant contends that the State failed to present sufficient evidence that he intentionally or knowingly caused bodily injury to Elvir. He argues that, at best, the evidence supports a finding that he recklessly caused bodily injury to Elvir, but this finding was not authorized by the information or the jury charge.

### A.     *Standard of Review*

When reviewing the sufficiency of the evidence, we view all of the evidence in the light most favorable to the verdict to determine whether any rational fact finder could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Adames v. State*, 353 S.W.3d 854, 859 (Tex. Crim. App. 2011). The jurors are the exclusive judges of the facts and the weight to be given to the testimony. *Bartlett v. State*, 270 S.W.3d 147, 150 (Tex. Crim. App. 2008). We may not re-evaluate the weight and credibility of the evidence or substitute our judgment for that of the fact finder.

*Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). We afford almost complete deference to the jury's credibility determinations. *See Lancon v. State*, 253 S.W.3d 699, 705 (Tex. Crim. App. 2008). We resolve any inconsistencies in the evidence in favor of the verdict. *Curry v. State*, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000); *see also Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007) ("When the record supports conflicting inferences, we presume that the factfinder resolved the conflicts in favor of the prosecution and therefore defer to that determination.").

Circumstantial evidence is as probative as direct evidence in establishing guilt, and circumstantial evidence alone can be sufficient to establish guilt. *Sorrells v. State*, 343 S.W.3d 152, 155 (Tex. Crim. App. 2011) (quoting *Clayton*, 235 S.W.3d at 778). "Each fact need not point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007).

## B. *Assault of a Family Member*

To establish that appellant committed the offense of assault on a family member, as charged in the information, the State was required to prove that appellant intentionally or knowingly caused bodily injury to Elvir, a person with whom he had a dating relationship, by pushing her with his hand, grabbing her with his hand, or

dragging her with his hand. *See* TEX. PENAL CODE ANN. § 22.01(a)(1) (West Supp. 2016). Assault by causing bodily injury is a "result-oriented" offense. *Darkins v. State*, 430 S.W.3d 559, 565 (Tex. App.—Houston [14th Dist.] 2014, pet. ref'd). Thus, the State must prove that the defendant caused the result—i.e., causing bodily injury to the complainant—with the requisite culpable mental state. *Id.* A person acts intentionally, or with intent, with respect to a result of his conduct when it is his conscious objective or desire to cause the result. TEX. PENAL CODE ANN. § 6.03(a) (West 2011). A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result. *Id.* § 6.03(b). The Penal Code defines "bodily injury" as "physical pain, illness, or any impairment of physical condition." *Id.* § 1.07(8) (West Supp. 2016).

Direct evidence of the requisite culpable mental state is not required. *See Hart v. State*, 89 S.W.3d 61, 64 (Tex. Crim. App. 2002); *Tottenham v. State*, 285 S.W.3d 19, 28 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd) ("[P]roof of a culpable mental state almost invariably depends on circumstantial evidence."). A defendant's culpable mental state can be inferred from his acts, words, and conduct. *Patrick v. State*, 906 S.W.2d 481, 487 (Tex. Crim. App. 1995); *see Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004) ("Intent may also be inferred from circumstantial evidence such as acts, words, and the conduct of the appellant."). The requisite culpable mental state may also be inferred from the extent of injuries to the

complainant, the method used to produce the injuries, and the relative size and strength of the parties. *Herrera v. State*, 367 S.W.3d 762, 771 (Tex. App.—Houston [14th Dist.] 2012, no pet.) (citing *Patrick*, 906 S.W.2d at 487); *see also Hart*, 89 S.W.3d at 64 (stating that intent and knowledge may be inferred from "any facts which tend to prove its existence, including the acts, words, and conduct of the accused, and the method of committing the crime and from the nature of the wounds inflicted on the victims") (quoting *Manrique v. State*, 994 S.W.2d 640, 649 (Tex. Crim. App. 1999)); *Montgomery v. State*, 198 S.W.3d 67, 87–88 (Tex. App.—Fort Worth 2006, pet. ref'd) (taking into account nature and extent of injuries in determining that sufficient evidence existed that defendant knowingly caused complainant's injuries).

Elvir testified that she and appellant got into an argument upstairs that continued downstairs in the kitchen. Appellant slammed the refrigerator door shut and then pushed her "really hard" into the coat closet door and held her there with his hand on her neck. Elvir announced that she intended to call the police, and she went into the living room to pick up her cell phone. Appellant followed her, and as she was unlocking her phone, he grabbed the phone and would not let go. Appellant and Elvir struggled to obtain control over the phone, and during the course of this struggle Elvir was pushed to the ground. Both appellant and Elvir continued to hold onto the phone, and appellant started to leave the house, "yanking and pulling" the

phone, and dragging Elvir through the living room and into the kitchen.[3] Elvir bumped into numerous objects while appellant was dragging her, including walls, cabinets, the couch, the television stand, the kitchen island, doors, and a table. Elvir's injuries included carpet burns and bruising in several areas on her body, including near her eye, her back, her elbow, her hands, and her forearm, and she also broke her toenail, which bled.

Elvir testified that both she and D.G., who was in the living room watching television, were screaming and crying throughout this incident. Elvir stated that she repeatedly told appellant to stop and give her the phone while she was crying and screaming. She further testified that appellant was approximately four inches taller than her, he was heavier than her, and she would not be able to physically restrain him if he were trying to leave.

Even if, as appellant contends, his focus was not to injure Elvir but to take the phone away from her and then leave the house, the record reflects that after Elvir fell to the floor during the struggle over her phone, appellant dragged her through multiple rooms of the house, while her body hit numerous objects in the house, before he was able to take the phone away from her. *See Guevara*, 152 S.W.3d at 50 (stating that mental state can be inferred from defendant's acts, words, and

---

[3] D.G. testified that Elvir held onto appellant's leg during the struggle, but she also stated that appellant dragged Elvir "around the whole carpet on the floor."

conduct); *Patrick*, 906 S.W.2d at 487 (same). Elvir screamed and cried and repeatedly asked appellant to stop and give her the phone, and she had injuries on multiple parts of her body. *See Hart*, 89 S.W.3d at 64 (stating that mental state can be inferred from method of committing crime and nature of wounds inflicted on complainant); *Herrera*, 367 S.W.3d at 771 (considering extent of injuries and method used to produce injuries).

Viewing the evidence in the light most favorable to the verdict, as we must, we conclude that a reasonable jury could have inferred from the evidence that appellant was aware that his conduct was reasonably certain to result in bodily injury to Elvir and, thus, that he acted with knowledge. *See* TEX. PENAL CODE ANN. § 6.03(b) (defining when actor acts "knowingly" or "with knowledge"). We hold that the State presented sufficient evidence that appellant acted with the requisite culpable mental state for the offense of assault on a family member by bodily injury.

We overrule appellant's first issue.

### Competency of Child Witness

In his second issue, appellant contends that the trial court erred by failing to make a competency finding concerning D.G. He also argues that D.G.'s testimony, on its face, demonstrated her lack of competency as a witness.

Generally, every person is presumed competent to testify. TEX. R. EVID. 601(a); *Hogan v. State*, 440 S.W.3d 211, 213 (Tex. App.—Houston [14th Dist.]

12

2013, pet. ref'd).  However, a person, such as a child, is not competent to testify if, upon examination by the trial court, the court finds that the person "lacks sufficient intellect to testify concerning the matters in issue."  TEX. R. EVID. 601(a)(2); *Torres v. State*, 424 S.W.3d 245, 254 (Tex. App.—Houston [14th Dist.] 2014, pet. ref'd); *Hogan*, 440 S.W.3d at 213.

The trial court does not have a duty to conduct a sua sponte preliminary competency examination of a child witness.  *Davis v. State*, 268 S.W.3d 683, 699 (Tex. App.—Fort Worth 2008, pet. ref'd); *see McGinn v. State*, 961 S.W.2d 161, 165 (Tex. Crim. App. 1998) ("[U]nlike the incompetency to stand trial statute, Rule 601 does not expressly impose upon the trial court the duty to conduct an inquiry on its own motion.").  Instead, the party seeking to exclude the witness from testifying must raise the issue of competency and "shoulders the burden of establishing incompetency."  *Gilley v. State*, 418 S.W.3d 114, 120 (Tex. Crim. App. 2014).  The competency of a child witness is a preliminary question for the trial court to determine under Rule of Evidence 104(a), and the court is not bound by the rules of evidence in making this determination.  *Id.* at 121; *see* TEX. R. EVID. 104(a) ("The court must decide any preliminary question about whether a witness is qualified . . . .").

When a party challenges the competency of a child witness, the trial court must consider whether the child witness possesses (1) the ability to intelligently

13

observe the events in question at the time of the occurrence, (2) the capacity to recollect the events, and (3) the capacity to narrate the events. *Torres*, 424 S.W.3d at 254; *Hogan*, 440 S.W.3d at 213–14. "The third element involves the ability to understand the moral responsibility to tell the truth, to understand the questions posed, and to frame intelligent answers." *Torres*, 424 S.W.3d at 254. The child witness need not understand the "obligation of the oath," but the trial court "must impress the child with the duty to be truthful." *Id.*; *see also Gilley*, 418 S.W.3d at 121 ("[A] trial court may also inquire whether the child-witness possesses the capacity to appreciate the obligations of the oath—or can at least distinguish the truth from a lie."). There is no precise age under which a child is deemed incompetent to testify. *Torres*, 424 S.W.3d at 255; *Escamilla v. State*, 334 S.W.3d 263, 265–67 (Tex. App.—San Antonio 2010, pet. ref'd) (upholding trial court's determination that child who was three years, nine months at time of trial was competent to testify).

Once the issue of competency is raised, the trial court must make "an independent ruling on competency." *Gilley*, 418 S.W.3d at 121. We review a trial court's determination of whether a child witness is competent to testify for an abuse of discretion. *Broussard v. State*, 910 S.W.2d 952, 960 (Tex. Crim. App. 1995); *Torres*, 424 S.W.3d at 254. We consider the child witness's responses to

14

qualification questions as well as the child's entire testimony in reviewing the trial court's ruling. *Davis*, 268 S.W.3d at 699.

Appellant contends that the trial court erred by failing to make a competency finding concerning D.G. Both appellant and the State represent in their respective appellate briefs that appellant's trial counsel did not object to D.G.'s competency and that the trial court did not hold a competency hearing and make competency finding on the record.

The trial court does not have a sua sponte duty to conduct a preliminary competency examination on its own motion. *McGinn*, 961 S.W.2d at 165; *Davis*, 268 S.W.3d at 699; *Fox v. State*, 175 S.W.3d 475, 480 (Tex. App.—Texarkana 2005, pet. ref'd). Moreover, failure to object to a child witness's competency in the trial court, as well as failure to object to the lack of a competency hearing by the trial court, waives the issue for appellate review. *See De Los Santos v. State*, 219 S.W.3d 71, 80 (Tex. App.—San Antonio 2006, no pet.) (holding that defendant's failure to object to child witness's competency at trial precluded him from raising issue for first time on appeal); *Fox*, 175 S.W.3d at 481 (holding that defendant failed to preserve error relating to trial court's failure to hold sua sponte hearing to determine child witness's competency); *see also Matson v. State*, 819 S.W.2d 839, 852 (Tex. Crim. App. 1991) ("It is a familiar rule of law that the failure to object to a witness's

15

competency to testify operates as a waiver of the witness's qualifications and may not be raised for the first time on appeal.").

However, in a letter subsequently filed with this Court, the appellate prosecutor stated that, after she filed the State's brief, appellant's trial counsel contacted her and informed her that counsel had objected to D.G.'s competency, the trial court had held a hearing, and counsel believed that the hearing had been recorded. The trial prosecutor informed the appellate prosecutor that that was his understanding as well. The appellate prosecutor then stated that she had viewed all available portions of the appellate record, but had not discovered a record of a competency hearing. This Court has also reviewed the appellate record and has not found a record of a competency hearing. Given the uncertainty over whether appellant objected to D.G.'s competency and whether the trial court held a competency hearing, in the interests of justice, we will review the available record of D.G.'s testimony to determine whether the record indicates that she was competent to testify. *See also Griffin v. State*, 514 S.W.2d 278, 281 (Tex. Crim. App. 1974) ("Usually, the competence of a witness is waived when she is permitted to testify without objection. *Unless a child's testimony shows on its face that he or she was incompetent to testify*[,] complaint as to her testimony raised for the first time on motion for new trial or on appeal comes too late.") (emphasis added) (quoting *Carr v. State*, 475 S.W.2d 755, 757 (Tex. Crim. App. 1972)).

16

After being sworn, D.G. stated her name, her age, her grade, and her elementary school. She also testified that her school was not located "here in town," that a year before the trial she lived "[i]n Katy at the apartment" with her mother "and somebody else," and that she remembered a time when her mother and this other person got into a fight. The prosecutor and D.G. then had the following exchange:

| | |
|---|---|
| [The State]: | Remember we talked about the difference between the truth and a lie? |
| [D.G.]: | Yes. |
| [The State]: | You told me—is it important to tell the truth? |
| [D.G.]: | Yes. |
| [The State]: | Do you know the difference between the truth and a lie? |
| [D.G.]: | Yes. |
| [The State]: | Okay. So if I said that I had a funny shoe on my head right now would that be the truth? |
| [D.G.]: | No. |
| [The State]: | That would be a lie, right? |
| [D.G.]: | Yes. |
| [The State]: | And why is it a lie? |
| [D.G.]: | Because there is no shoe on your head. |
| [The State]: | Right. What is on my head? |
| [D.G.]: | Your hair. |
| [The State]: | That would be the truth, right? |
| [D.G.]: | I understand. |

17

| [The State]: | Do you promise to just tell the truth while you're in the courtroom today? |
|---|---|
| [D.G.]: | Yes. |

The prosecutor then asked questions about the incident between appellant and Elvir, and D.G. was able to respond. She recalled that she was sitting on the living room couch watching cartoons, that the argument between appellant and Elvir was loud, that the argument started upstairs and moved downstairs, that appellant first pushed Elvir into a closet door, that Elvir responded by telling appellant that she was going to call the police, that Elvir reached her phone and started to dial but appellant grabbed the phone and they started struggling, that appellant dragged Elvir "around the whole carpet on the floor," and that appellant went outside "because he got the phone." D.G. testified that Elvir was screaming and crying.

On cross-examination, D.G. agreed with defense counsel that she spoke with her mother the week before trial and the week of trial and that her mother "talked to [her] about what [she] was going to say." D.G. also gave details about Elvir's injuries, stating, "They checked her arm because Mommy thought it was broken, but then they took her to the hospital. And then she had bruising all over her and her toe was kind of cracked open."

On redirect examination, the prosecutor asked D.G. if Elvir told her to tell the truth, if Elvir said "it's okay if you don't remember," and if she remembered "it's

18

always important to tell the truth." D.G. responded in the affirmative to all three questions.

D.G. was able to clearly articulate what occurred between appellant and Elvir. She was able to answer the questions asked of her by both the State and defense counsel, and she was able to give a coherent narrative about the incident. The record reflects few inconsistencies in her testimony and little hesitation in answering questions. The record thus indicates that D.G. had the ability to intelligently observe the events in question at the time of the occurrence, the capacity to recollect the events, and the capacity to narrate the events. *See Torres*, 424 S.W.3d at 254. Furthermore, D.G. was sworn, and the prosecutor questioned her about the difference between the truth and a lie. She demonstrated that she understood the difference between the truth and a lie, and she twice agreed with the prosecutor that it was important to tell the truth. The record therefore reflects that D.G. understood the need to be truthful in her testimony. *See id.*

On appeal, appellant argues that D.G. was not competent to testify in part because she revealed that she had spoken with Elvir about her testimony before trial, which reflected "potential improper influence." Whether Elvir improperly influenced the substance of D.G.'s testimony is a matter relating to D.G.'s credibility as a witness, not her competency. Appellant elicited the possibility of Elvir's influence on cross-examination of D.G. and had the opportunity to probe further

19

concerning this influence. Moreover, D.G. later testified that Elvir had told her to tell the truth and that she knew that it was important to tell the truth.

Appellant also argues that D.G.'s "extremely young age" demonstrates a facial lack of competency. Courts have held, however, that there is no precise age under which children are deemed incompetent to testify. *Torres*, 424 S.W.3d at 255; *Escamilla*, 334 S.W.3d at 265. D.G. was five years old at the time of the incident and six years old at the time of trial. It is not uncommon for appellate courts to uphold trial courts' findings that children around this age are competent to testify. *See Torres*, 424 S.W.3d at 255 (holding that trial court did not abuse its discretion in allowing seven-year-old to testify); *Davis*, 268 S.W.3d at 698–700 (allowing five-year-old to testify); *Berotte v. State*, 992 S.W.2d 13, 17–18 (Tex. App.—Houston [1st Dist.] 1997, pet. ref'd) (allowing four-year-old to testify); *see also Escamilla*, 334 S.W.3d at 265–67 (allowing child who was two years old at time of sexual abuse and three years and nine months at time of trial to testify).

Finally, appellant argues that the "complete lack of questioning by the parties or the court regarding D.G.'s understanding of the significance of the oath" rendered her facially incompetent to testify. The record reflects that D.G. was sworn, and appellant is correct that no one questioned her specifically about the oath that she had taken and why it was important. She testified twice, however, that it was "important" to tell the truth, and she promised to only tell the truth while she was in

the courtroom. "Although the child need not understand the 'obligation of the oath,' the trial court must impress the child with the duty to be truthful." *Torres*, 424 S.W.3d at 254; *Berotte*, 992 S.W.2d at 18 ("A child does not need to understand the obligation of the oath, but the child must understand the obligation to be truthful."). Although D.G. did not testify that she understood the important of the oath that she had taken, she testified that she understood the difference between the truth and a lie, that she understood the importance of telling the truth, and that she promised to tell the truth while in the courtroom. *See Gilley*, 418 S.W.3d at 121 ("[A] trial court may also inquire whether the child-witness possesses the capacity to appreciate the obligations of the oath—or can at least distinguish the truth from a lie.").

We conclude that D.G.'s testimony does not demonstrate on its face that she was not competent to testify. *See Griffin*, 514 S.W.2d at 281. We therefore hold that D.G. properly testified at appellant's trial.

We overrule appellant's second issue.

## Conclusion

We affirm the judgment of the trial court.


Evelyn V. Keyes
Justice

Panel consists of Justices Keyes, Bland, and Huddle.

Publish.  TEX. R. APP. P. 47.2(b).