

# In the
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-24-00142-CR

RANDY KEITH KELSOE, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 102nd District Court
Red River County, Texas
Trial Court No. CR03385

Before Stevens, C.J., van Cleef and Rambin, JJ.
Memorandum Opinion by Justice van Cleef

MEMORANDUM OPINION

A Red River County jury found Randy Keith Kelsoe guilty of murder and sentenced him to sixty years' incarceration. *See* TEX. PENAL CODE ANN. § 19.02 (Supp.). Kelsoe's sole issue on appeal challenges the legal sufficiency of the evidence to support his conviction. Because we find that a rational jury could conclude beyond a reasonable doubt that the State met its burden that Kelsoe intentionally or knowingly caused the death of the victim, Mikael Kelsoe, we affirm the trial court's judgment.

## I.    The Evidence at Trial

Kelsoe was indicted for the murder of his father, Mikael, "by causing blunt force injuries and or asphyxia by external compression of the neck." Chief Deputy Robert McCarver of the Bowie County Sheriff's Office (BCSO) testified that he was called to Christus St. Michael Hospital in Texarkana regarding a death at the hospital. The deceased had been dropped off at the hospital with an explanation by Kelsoe that the deceased had fallen off of the porch, but the hospital had concerns that the injuries were not consistent with a fall. According to McCarver, the injuries appeared consistent with someone who had been "severely beaten." McCarver testified that Kelsoe left the hospital before he could meet with him, and when McCarver attempted to contact Kelsoe, he could not get in touch with him.

Texas Ranger Stacy McNeal, a trained blood stain pattern analyst, investigated the scene where Mikael's injuries occurred. There was the presence of blood on the back porch and two areas in the grass. He stated that the grassy areas, which were six to eight feet off of the back porch, contained "saturated blood stains," which "would be where a significant amount of blood

2

would gather there on the surface and kind of pool up." The blood on the porch, however, appeared to be "drip stains" and were very small. McNeal stated that the back porch had "no steps that require[d] you to step up from the yard" and did not have "any height" to it. He also opined that the injuries did not appear to be consistent with a fall.

McNeal interviewed Kelsoe along with his brother, his uncle, and several other witnesses. Kelsoe informed McNeal that he was the only person with Mikael when the fall occurred and that he did not observe the fall. He stated that he "could only hear what he thought was a fall." Kelsoe stated that he found his father hurt and "convulsing or flopping around on the ground." McNeal stated that Kelsoe did not have a certain answer when asked where his father had fallen, whether it was on the concrete or the grass. Kelsoe put his father into a truck and took him to the hospital.

Medical examiner Chester Gwin, M.D., with the Southwestern Institute of Forensic Sciences, testified that he performed the autopsy of Mikael. Upon his external examination of Mikael's body, Gwin took pictures of Mikael's body and injuries. Gwin testified that he noted "a lot of injury particularly at the central aspect of the face, the left side of the forehead extending all the way over the nose, the mouth, the left side of the face." He continued, "There appear to be two paired abrasions going basically from the left eyebrow ridge across the left side of the face and associated with that are several lacerations." The injuries located on Mikael's face "indicate[d] that there was some object that struck the face or the face struck some object that's caused the injury." Mikael's facial injuries indicated that both sides of his face had been struck by something blunt. Gwin also noted bruising and injury to Mikael's right hip and right

shoulder and a fracture to the right clavicle. Mikael also had bruising to his chin, underneath his chin, and along his neck. In examining Mikael's eyes, Gwin noted "little pinpoint hemorrhages," which indicated "compression of the neck because the blood [was] being trapped up into the head and that blood pressure [became] too great for that small vessel and it burst[]."

Gwin performed an internal autopsy of the body as well, and in removing the "wind pipe" or the "neck structure," there were "hemorrhages in several of those muscles," which indicated injury to that area of the body. Mikael also suffered a fracture of his spine in the neck region, which indicated "there was some type of force applied to the neck." Gwin opined that the injuries were caused by "[b]lunt force injuries consistent with an assault" and not a fall.

Justin Kelsoe, Kelsoe's older brother, testified that things between Kelsoe and Mikael had not always been good and that he had witnessed verbal and physical altercations between the two. Justin stated that Mikael had "personally told" him that he was afraid of Kelsoe. Justin explained that after an incident where Kelsoe pushed Mikael, Justin and Mikael had a restraining order placed against Kelsoe. Justin stated that he dropped the restraining order after their mother passed away because Kelsoe would not have been able to attend the funeral if the restraining order remained in place. Justin explained that things had gotten better between Mikael and Kelsoe and that on the day of Mikael's death, he believed things were good. Justin explained that earlier on that day, he was with his father and invited him to stay and have dinner at his house, but that his father declined and stated he had planned to "go home and cook steaks at the house" with Kelsoe. Not long after his father left, Justin received a call from Kelsoe telling him that their "dad's head was bleeding, he was thrashing around, [and he] looked like he was having

4

convulsions or some kind of fit." Justin stated that he told Kelsoe to take their father to the hospital and that Kelsoe called him several more times to get further help, asking questions about what to do next, asking what hospital to go to, and asking when Justin and his family would be on their way. When Justin got to the hospital, he was told that Mikael was deceased. He explained that Kelsoe's behavior was peculiar at the hospital—wanting to leave before other family arrived and not wanting to sign paperwork from the hospital staff or provide his information to them. Justin ultimately stated that, while he did not want it to be the case, he believed "[w]ith all [his] heart and soul" that his brother killed their father.

David Jones, a registered nurse at the hospital, testified that he assisted in the removal of Mikael from the backseat floorboard of a red truck when the truck arrived at the hospital. Mikael had no pulse and was not breathing upon arrival. Kelsoe told the hospital staff that Mikael "fell" and struck his head on the ground. Jones testified that there were concerns that the injuries did not align with the story told to them. Jones testified that the injuries were consistent with blunt force trauma to the face, chest, throat, and head. Jones testified that it was hospital procedure to inform law enforcement when the staff believed "foul play" was involved in an incident, which they did in this case given the inconsistencies in Kelsoe's story and Mikael's injuries. When Jones attempted to speak with the individual who brought Mikael to the hospital, Kelsoe was no longer present at the hospital. Another registered nurse at the hospital, Kelsie Bell, testified similarly to Jones regarding the injuries sustained by Mikael. Bell was the nurse who notified law enforcement because she believed an investigation needed to be done as to the cause of Mikael's injuries.

5

Kelsoe testified in his own defense. Kelsoe explained that on the day of the incident, he had gone to Avery to spend some time with his family, particularly his father. According to Kelsoe, Mikael had a "very serious" fall about four to six weeks before that day and had head injuries as a result, and the family had been spending more time with Mikael as a result. At some point in the day, he and his father were in his father's backyard looking at the cows when his father received a call that caused him to leave the house for a while. He waited for his father in front of his father's house and explained that when Mikael returned, he got out of his truck and said, "That blank better not be in my pills." Kelsoe explained that Mikael used a curse word. About five to ten minutes later, Kelsoe recalled seeing his father on the ground in the backyard and noticed how Mikael was moving. While he was unsure of exactly what he told law enforcement about the situation, he stated it was because he was in shock. He said he recalled that he grabbed his father and pulled him to a safe position further from the house. Kelsoe stated that he struggled to lift his father into the truck that he had driven around to take him to the hospital. He stated that "any injuries [Mikael] sustained in [his] care" as he attempted to load him in the truck were "accidental" and would have come from the door jamb of the vehicle He further explained that he did not wish to be "misleading" in his explanation of what happened, he did not actually see a fall, and he assumed his father had fallen given how he found him. He stated he did not try to evade anyone or any questions, that he met with several employees at the hospital, and that he was open with law enforcement during the investigation.

Kelsoe generally disputed the incident described by his brother in regard to pushing Mikael one time, but he explained that he did have an incident similar to that with his brother.

6

Kelsoe also explained that he had a criminal history that involved family violence assault. Kelsoe previously had a methamphetamine problem and a problem with alcohol but stated that that was in his past. When presented with his prior criminal history, which involved the choking of two different women, one in 2005 and one in 2018, he denied that those incidents occurred. He also denied that he threatened his parents with a knife in 2018, stating that the incident "was blown out of proportion." While he did not recall mentioning the injuries possibly occurring from the door jamb of the vehicle, he stated that he told the officers he had "difficulty" getting his father into the truck.

At the close of the evidence, the jury found Kelsoe guilty of murder and, after the punishment phase of the trial, the trial court sentenced Kelsoe to confinement for a period of sixty years and a $10,000.00 fine.

## II. Standard of Review and Applicable Law

"The due process guarantee of the Fourteenth Amendment requires that a conviction be supported by legally sufficient evidence." *Braughton v. State*, 569 S.W.3d 592, 607 (Tex. Crim. App. 2018). "In evaluating legal sufficiency, we review all the evidence in the light most favorable to the trial court's judgment to determine whether any rational jury could have found the essential elements of the offense beyond a reasonable doubt." *Williamson v. State*, 589 S.W.3d 292, 297 (Tex. App.—Texarkana 2019, pet. ref'd) (citing *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (plurality op.)). "Our rigorous [legal sufficiency] review focuses on the quality of the evidence presented." *Id.* (citing *Brooks*, 323 S.W.3d at 917–18 (Cochran, J., concurring)). "We examine legal sufficiency under the direction of the *Brooks*

opinion, while giving deference to the responsibility of the jury 'to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'" *Id.* (quoting *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007))).

"In our review, we consider 'events occurring before, during and after the commission of the offense and may rely on actions of the defendant which show an understanding and common design to do the prohibited act.'" *Id.* (quoting *Hooper*, 214 S.W.3d at 13). "It is not required that each fact 'point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction.'" *Id.* (quoting *Hooper*, 214 S.W.3d at 13). "Circumstantial evidence and direct evidence are equally probative in establishing the guilt of a defendant, and guilt can be established by circumstantial evidence alone." *Id.* (citing *Ramsey v. State*, 473 S.W.3d 805, 809 (Tex. Crim. App. 2015); *Hooper*, 214 S.W.3d at 13). "Further, 'we must consider all of the evidence admitted at trial, even if that evidence was improperly admitted.'" *Id.* at 297–98 (quoting *Fowler v. State*, 517 S.W.3d 167, 176 (Tex. App.—Texarkana 2017), *rev'd in part*, 544 S.W.3d 844 (Tex. Crim. App. 2018)).

A person commits murder if he "intentionally or knowingly causes the death of an individual." TEX. PENAL CODE ANN. § 19.02(b)(1). "A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result." TEX. PENAL CODE ANN.

8

§ 6.03(a). "Proof of a culpable mental state is often made by circumstantial evidence." *Rhymes v. State*, 536 S.W.3d 85, 95 (Tex. App.—Texarkana 2017, pet. ref'd) (quoting *Louis v. State*, 329 S.W.3d 260, 268 (Tex. App.—Texarkana 2010), *aff'd*, 393 S.W.3d 246 (Tex. Crim. App. 2012) (citing *Dunn v. State*, 13 S.W.3d 95, 98–99 (Tex. App.—Texarkana 2000, no pet.))). When "determining a defendant's state of mind, the jury may consider all of the circumstances." *Id.* (citing *Smith v. State*, 965 S.W.2d 509, 518 (Tex. Crim. App. 1998)). "The requisite culpable mental state may also be inferred from the extent of injuries to the complainant, the method used to produce the injuries, and the relative size and strength of the parties." *Baldit v. State*, 522 S.W.3d 753, 759 (Tex. App.—Houston [1st Dist.] 2017, no pet.) (citing *Herrera v. State*, 367 S.W.3d 762, 771 (Tex. App.–Houston [14th Dist.] 2012, no pet.) (citing *Patrick v. State*, 906 S.W.2d 481, 487 (Tex. Crim. App. 1995))); *see Hart v. State*, 89 S.W.3d 61, 64 (Tex. Crim. App. 2002) (stating that intent and knowledge may be inferred from "any facts which tend to prove its existence, including the acts, words, and conduct of the accused, and the method of committing the crime and from the nature of the wounds inflicted on the victims" (quoting *Manrique v. State*, 994 S.W.2d 640, 649 (Tex. Crim. App. 1999) (Meyers, J., concurring))); *Montgomery v. State*, 198 S.W.3d 67, 87–88 (Tex. App.–Fort Worth 2006, pet. ref'd) (taking into account nature and extent of injuries in determining that sufficient evidence existed that defendant knowingly caused complainant's injuries); *Duren v. State*, 87 S.W.3d 719, 724 (Tex. App.—Texarkana 2002, pet. struck).

**III.     Legally Sufficient Evidence Supports the Jury's Finding of Guilt**

In one paragraph of his brief, Kelsoe makes his argument as to his sole issue on appeal, stating that the evidence in the record does not support a conviction that he intentionally caused the death of his father. While he agrees that the medical examiner determined that the cause of death was from "an assault," he asserts that the "evidence as a whole is insufficient to support . . . intent."

The jury heard evidence that Mikael sustained serious injuries leading to his death. The medical examiner testified that Mikael suffered blunt force injuries to his head and face, as well as asphyxiation. The jury saw pictures of Mikael in the hospital and was able to judge the extent of those injuries. Furthermore, while Kelsoe did bring his father to the hospital, there was evidence that the story Kelsoe told as to how his father sustained his injuries was false, that Kelsoe made himself unavailable to talk to staff or police at the hospital, and that Kelsoe was unable to give clear information as to what happened to his father. There was also testimony of prior altercations between Kelsoe and his father and of previous animosity between Kelsoe and his family. While Kelsoe testified that any injuries he may have caused Mikael were from attempting to get Mikael into the truck, the jury was free to disbelieve that self-serving testimony.

"Viewing the evidence in a light most favorable to the verdict, we find that a rational jury could have found beyond a reasonable doubt that [Kelsoe] intentionally or knowingly killed [Mikael]." *Lay v. State*, 359 S.W.3d 291, 295 (Tex. App.—Texarkana 2012, no pet.). Therefore, we overrule Kelsoe's legal sufficiency challenge. *See id.*

10

## IV.    Conclusion

We affirm the judgment of the trial court.

Charles van Cleef
Justice

Date Submitted:    June 18, 2025
Date Decided:      July 14, 2025

Do Not Publish