COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



EVER MENDEZ,          §

           Appellant,      §

v.                     §

THE STATE OF TEXAS,    §

           Appellee.       §

                       §

No. 08-17-00076-CR

Appeal from the

205th District Court

of El Paso County, Texas

(TC# 20160D04905)

## O P I N I O N

Appellant Ever Mendez appeals his conviction for the capital murder of I.V.,[1] the two-year-old child of his girlfriend, Dora Villanueva. Following a jury trial, Mendez received a mandatory sentence of life imprisonment.[2] On appeal, Mendez asserts several evidentiary challenges which primarily concern the admission of testimony from I.V.'s sister, K.V., who was four years old at the time of the incident and nine years old at the time of trial. In addition, Mendez also challenges the trial court's admission of complained-of extraneous offense evidence. Finding no error, we affirm as reformed.

---

[1] To protect the anonymity of the children in this case, we will use initials to refer to them. *See* TEX. R. APP. P. 9.10(a)(3); *McClendon v. State*, 643 S.W.2d 936, 936 n.1 (Tex. Crim. App. [Panel Op.] 1982).

[2] The judgment of conviction erroneously recites that Appellant waived his right to a jury trial. We will reform the judgment to reflect Appellant was tried by a jury.

# BACKGROUND[3]

## Pretrial Events

### *The Apartment*

At trial, Villanueva testified she met Mendez in January of 2012, and soon they were dating. At the time, Villanueva and her three young children, J.R., K.V., and I.V.—who were then seven, four, and two, respectively—were living with her mother. Wanting a relationship, Villanueva invited Mendez to her mother's house to have dinner on an everyday basis. As their relationship grew, Mendez expressed an interest in wanting to be a father figure to her children to include having a role as a disciplinarian. Villanueva soon allowed him to use forms of discipline with her childing including placing them in time-out, spanking, and hitting with a belt.

On March 17, Villanueva described that Mendez came to her saying that her mother and sister had confronted him at his work about hitting her kids. He denied their accusation and invited her that day to move in with him where he lived with his mother Cecilia (Ceci). Not having seen anything concerning, Villanueva accepted his invitation and quickly moved her children and herself to live with him. During the day, while Villanueva worked, J.R. went to school, K.V. went to daycare, and Mendez helped care for two-year old I.V., who expressed a desire not to go to daycare. After two weeks, they all moved out of his mother's home and went to live temporarily with his brother Joe and his family. By late April, Mendez began taking care of both K.V. and I.V. as Villanueva no longer relied on daycare for either one of her two younger children. On May 1, Joe's wife moved out of the apartment with their children. Villanueva and

---

[3] In the interest of brevity, we discuss the basic underlying facts of the case here. Facts more pertinent to each issue will be discussed in greater detail where needed within each issue on appeal.

Mendez planned on moving the afternoon of May 11, 2012, as they had found a place of their own.

Early in the morning of their moving day, Mendez arrived home about 4 a.m. from a night out. Villanueva woke up and helped I.V. use the restroom with a "potty chair," then they all went back to sleep. About 7 a.m., Villanueva got ready for work and soon left to take J.R. to school, while Mendez, K.V., and I.V. continued sleeping. After dropping off J.R., Villanueva returned to the apartment to grab the breakfast she had forgotten, then quickly left for work. While there, she saw that all three were still asleep in the same position as when she had left earlier.

At about 11 a.m., Villanueva received a call from Mendez, who told her that he had just woken up. After Mendez asked what time she would be home from work, she told him she would be out at noon and they could start moving afterwards. About twenty minutes later, Mendez called again, and she confirmed she would be leaving at noon. When she asked if anything was wrong, he said, "No." During their second call, Villanueva noticed that Mendez seemed "a little anxious." Twenty minutes later, Mendez called a third time, but this time he was "hysterically crying." Having difficulty understanding, Villanueva thought she heard Mendez say that he needed her to come home because his brother Joe would not wake up. Villanueva left work immediately. While she drove, Mendez called her again, crying, and urging her to come quickly. Villanueva told Mendez to go ahead and call an ambulance. After Mendez hung up, Villanueva called Mendez's mother to tell her about Joe. To her relief, she learned that Joe was then out with her and he was fine.

On arriving, Villanueva entered their apartment and first saw her four-year-old daughter K.V. sitting on a sofa "staring, zombie like" at the television. She then found Mendez crying and kneeling next to I.V., who lay motionless on the floor. When Villanueva asked him what

3

happened, he responded that he did not know but he needed her help. Villanueva got on her knees and started performing CPR. She noticed I.V. felt very cold and made "a snoring noise" as she worked on him. When her efforts failed to produce a response, she picked him up and took him to the bathroom. Although she ran water over him, it had no effect. She then returned to his room and checked his airway by putting her finger in his throat, but it too had no effect. She then decided to call Mendez's mother to tell her what was going on, and explained it was I.V. who Mendez had called about, and he needed help. After her call, Villanueva told Mendez she needed to call 911 to get help. Mendez responded, "Don't call the cops because they're going to take me to jail." Villanueva called anyway and spoke with a 911 operator. Soon, Mendez's mother arrived and began hitting Mendez on his head while saying, "You killed him. You killed him already. You already killed him."

Once EMS arrived they ordered everybody out of the room. While waiting, Mendez pulled her aside and commented, "Right now when they ask you if you went to work, go ahead and tell them you did not go to work, that you went—that you were actually here all day." When she asked why, he replied, "Because you're going to get in trouble." Villanueva asked, "for what?" Mendez replied, "for leaving the kids with me." Once she realized she had scanned her badge at work, Villanueva knew that police would easily discover she worked that morning. Police officers who later arrived ordered her not to leave as the ambulance left with I.V. While they waited to speak to officers, Mendez said to her, "All this time I've been getting you ready and I need you now to be that strong person I've tried to make you all this time because I am going to—I'm going to go away for quite a while." Villanueva described that police later arrested Mendez at the scene on a warrant against him for owing child support.

4

Later that afternoon, four-year-old K.V. was interviewed at the Child Advocacy Center (CAC) by Max Zimmerly, an interviewer of the center. During the interview, K.V. told Zimmerly that when the incident occurred, Mendez was present, but her mother was at work and her brother J.R. had gone to school. When asked, K.V. told Zimmerly that I.V. was "with the police . . . [and] him died." K.V. said that "[she] saw him died," and that "[Mendez] kicked him right here [gesturing to her torso] and him died." Afterwards, she said that Mendez was saying, "Wake up, [I.V.]!"

*Law Enforcement Investigation*

Sergeant Lawrence Lujan of the El Paso Police Department testified that he heard a call on the radio reporting that CPR was being performed on a two year old, so he responded. On arrival, he found Mendez crying, distraught, animated, and walking around while putting his hands on the top of his head. Although Villanueva appeared calmer, she also looked as if she had been crying. When he looked inside the ambulance where paramedics worked on I.V., Sergeant Lujan noticed that I.V.'s stomach was "extremely distended . . . swollen out[,] and [he] could also see a dark-colored bruise under his chin." When Lujan asked what happened, Mendez responded that he had last seen I.V. awake about 7 a.m. that morning when he had awaken to use the restroom. Mendez described that he and I.V. fell back to sleep, and when he awoke later, he found him unresponsive. Mendez then described the unsuccessful attempts by Villanueva to revive I.V. Sergeant Lujan asked Mendez to show him where he had found I.V., and Mendez showed him a room with no bed but several blankets on the floor. Sergeant Lujan testified he smelled an odor, then noticed a blanket and a sock full of feces laying on the floor. Mendez explained to him that he had used the sock to clean I.V. earlier.

5

Once he learned that I.V. had been pronounced deceased on arrival at a nearby hospital, Sergeant Lujan testified he left the apartment to go see him. At the hospital, Sergeant Lujan saw that I.V. was covered in bruises of different shapes, sizes, and colors, on the front part of his chest, on his facial area, on his back, and on his shoulder. He also appeared to have a bite mark on his left leg. Photographs were later taken of I.V.'s body which showed a multitude of bruises, scratches and bumps on his head, torso, legs, and feet.

*Events at the Police Station*

At trial, Detective David Samaniego of the El Paso Police Department testified to a conversation he had with Mendez at the police station. As Samaniego passed by a holding cell, Mendez called out to him asking whether I.V. had died. Detective Samaniego testified that he responded, "Yes." Mendez next asked whether he and Villanueva were considered suspects. Samaniego responded, "Yes." Later, Mendez asked whether Villanueva's other children would be taken away from her. After Detective Samaniego responded that removal remained a possibility, Mendez told him he would tell him what had happened if they first allowed him to speak to Villanueva. When Detective Samaniego asked Mendez what he had to say, Mendez replied that "he went overboard," but would not provide any further details until after he spoke with Villanueva. Although Villanueva expressed reluctance, eventually she agreed to speaking with Mendez.

In their ensuing conversation held in an interview room equipped with a recorder, Mendez told her to "take care of your two other kids . . . I got to pay for what I did." Also, he said, "I admit it. I went too far. Whatever. And now I got to pay for it babe." When Villanueva asked him whether he kicked I.V. in the stomach, he denied doing so but said that he "just punished

6

him," and that he "hit [I.V.] the same way [he] always hit him" and that "maybe it went . . . overboard." Mendez explained that he thought I.V. did not want to get up, and that was why he had called for Villanueva to come home. Mendez also stated that he was "not capable of this," and lamented the fact that his mother accused him of hitting I.V. with a stick. He later admitted he needed to "calm [his] temper down."

After his talk with Villanueva, Mendez agreed to an interview with Detective Samaniego. During this interview, Mendez claimed that he had seen J.R. getting ready for school when he and Villanueva first awoke around 7 a.m. He described that I.V. awoke and asked to use the bathroom. Afterward, Mendez told him to go back to sleep because he felt hungover and wanted to continue sleeping. When Mendez woke up, he noticed that I.V. did not want to get up and put him in time-out because he was not getting out of bed. Mendez described that he made I.V. "face the wall" due to him not behaving. When I.V. complained about being the only one facing the wall, Mendez spanked him then went back to making breakfast. Mendez described that he went back and forth between the kitchen and I.V.'s bedroom. As I.V. stood in time-out, Mendez continuously spanked and hit him. After hitting I.V., Mendez described that he fell, became unresponsive, and did not get up any further. Mendez described that he tried to revive him by pouring water on him, but it had no effect.

When Detective Samaniego asked Mendez about bruises, cuts, and bumps he had seen on I.V.'s body, he claimed that I.V. had scraped himself playing in a park, that a dog had scratched his face, and that he had fallen off a chair. Although Mendez admitted he had struck I.V., he claimed he did not do so with enough force to cause his death. Mendez expressed disbelief that I.V. had died because of the force he had used when he had struck him. When Detective

7

Samaniego asked Mendez about K.V. saying he had kicked I.V., initially he replied, "[i]f that's what she says," but later he denied doing so.

## Trial Issues

At trial, much of the State's theory of guilt centered around testimony from Villanueva, from law enforcement, from admission of recorded statements from Mendez, and as explained in more detail below, from K.V., who was four years old at the time of I.V.'s death and nine years old at the time of trial. K.V. testified that she was present in the apartment when I.V. died. K.V. described that I.V. had "poop[ed] and pee[d] in his pants," so Mendez grabbed him, spanked him, and punched him in the stomach. K.V. described I.V. as remaining "on the floor," and he did not move or get up. K.V. then described that her mother returned from work and tried "to give [I.V.] CPR." Asked to describe Mendez's general treatment of her, K.V. testified he was mean and would hit her with a belt all over her body. She also described that he would make her brothers do "like a push-up but putting stuff on their back." The State also presented testimony from J.R., I.V.'s and K.V.'s older brother, who testified that Mendez had physically abused him and his siblings.

Other key issues at trial included the timing and cause of I.V.'s death. The State called Dr. Juan Contin, an El Paso County Deputy Medical Examiner. Dr. Contin testified that he conducted an autopsy a few days after I.V.'s death. Based on his examination, Dr. Contin concluded that I.V. died as a result of "intra-abdominal bleeding due to blunt force injury to the abdomen," with the force of the impact being of "such magnitude that it caused a splitting of the liver." Additionally, Dr. Contin noted there were "no less than 50 contusions . . . throughout the body." He concluded that I.V.'s death resulted from physical abuse and deemed the manner of

8

his death a homicide. Dr. Contin added that I.V.'s injuries were consistent with being kicked in the abdomen with a foot or being struck by some unknown object. Dr. Contin further stated that while the amount of free blood (70cc) collected from I.V.'s abdomen was not enough to cause death by itself, his blood loss from hemorrhaging in the retroperitoneal area, mesocolon, diaphragm, and lungs was sufficient to cause his death. Dr. Contin stated these injuries were caused by multiple blows, and that he could not have survived more than "a couple of hours, maybe."

During its case-in-chief, the defense called its own medical expert, Dr. Harry Wilson, to present his own findings regarding I.V.'s death. Dr. Wilson testified he was employed as a pediatric pathologist. While he did not dispute that I.V.'s liver had been torn in two due to blunt-force trauma, or that I.V. had sustained countless other injuries as described by Dr. Contin, Dr. Wilson disagreed that rapid blood loss had been an immediate cause of I.V.'s death. As such, Mendez's defensive theory rested on the premise that the timeline of I.V.'s death was inconsistent with the State's theory that Mendez struck I.V. and he died shortly afterward. Asserting that both Villanueva and Mendez's brother Joe, or somebody else, had been present in the apartment from four to eight hours before I.V.'s death, he claimed others could have struck the blows to I.V. which eventually proved fatal.

The defense also announced its intent to call Dr. James Wood, a clinical psychologist, to testify regarding K.V.'s competency as a witness. From Dr. Wood, the defense sought to elicit testimony about young children's susceptibility to suggestive interview practices, and that he observed such practices in K.V.'s interview with Max Zimmerly at the CAC. If called, Dr. Wood would also testify about the tendency for children younger than five years of age to have poor

memory generally (known as "infantile amnesia"), and that he would expect to find this in a nine-year-old child who was testifying about events which occurred before she had reached the age of five. The trial court excluded Dr. Wood's testimony, reasoning that not only would it have amounted to an improper opinion that K.V. was not credible, but it would also likely cause confusion for the jury. Finally, the defense sought to admit portions of the recording of the interview with K.V.—which was conducted in a CAC room painted with a rainbow and pot of gold on its wall—to impeach K.V. at trial with prior inconsistent statements made during her interview. The defense did not, however, specify which portions of the recording it wanted the trial court to admit. After finding no inconsistent statement on review of the recording, the trial court refused to admit what the defense had tendered for admission.

After deliberating, the jury convicted Mendez of capital murder of a person under six years of age, and he received a mandatory sentence of life imprisonment. This appeal follows.

## I.

## DISCUSSION

Mendez challenges his conviction in seven issues. He argues his conviction should be reversed and a new trial granted on the basis that: (1) the trial court erred in excluding Dr. James Wood's expert testimony on the subject of K.V.'s competency to testify at trial; (2) the trial court should have admitted Dr. Wood's testimony to impugn the reliability of K.V.'s testimony; (3) the trial court erred in excluding a recording of K.V.'s interview because the defense should have been allowed to impeach K.V. with prior inconsistent statements from her prior interview; (4) the trial court erred by excluding the CAC interview, which he argues would have shown that K.V. did not remember or was mistaken about the matters discussed during her interview; (5) the trial court

erred by admitting hearsay statements made by K.V. which implicated Mendez in the death of I.V.; (6) the trial court erred in admitting extraneous offense evidence regarding Mendez's alleged abuse against children other than I.V.; and (7) the trial court erred in admitting extraneous offense evidence regarding Mendez's prior conviction for aggravated assault with a deadly weapon. Since several of Mendez's complaints implicate similar inquiries, we will address related issues together where possible for brevity.

## Trial Court's Competency Examination and Exclusion of Expert Testimony

In Issues One and Two, Mendez argues that the trial court erred by excluding expert testimony of Dr. James Wood on the question of K.V.'s competency and reliability to testify as a witness. While Mendez frames these issues under the same general complaint about exclusion of expert testimony, we construe his brief to raise two separate inquiries: first, whether the trial court erred in how it conducted a competency examination, or otherwise in refusing to allow defense counsel to participate in the examination; and second, whether the trial court erred by excluding Dr. Wood's proffered expert testimony related to K.V's competency and reliability. While we acknowledge that each issue impacts the other, we address each matter separately for the sake of clarity.

### Trial Court's Competency Examination

*K.V.'s Competency Examination and Testimony*

The State called K.V. to testify during its case-in-chief. Prior to hearing K.V.'s testimony, defense counsel requested that the trial court not only inquire as to whether K.V. could tell the difference between a truth and a lie, but also whether she was able to recall and accurately report events occurring at a time when she was younger than five years of age. After administering an

11

oath to tell the truth, the trial court asked her how old she was, whether she knew where she was, and whether she knew the court's role in the proceeding. K.V. responded that she was nine years old, she knew she was in a courthouse, and she knew he was a judge. Responding to other questions, K.V. described that she had been earning high marks while attending third grade at Marian Manor school. She assured the court that she paid attention in class and did not get into trouble. When asked, she testified she knew the difference between a truth and a lie. Asked to elaborate, she said, "[t]he truth is when you say it's an ice cream. 'It's an ice cream.' But if you say—it's a hamburger and you say 'ice cream' and it's not, it's a lie." When the court asked her to explain her understanding of the meaning of raising her hand and taking an oath, she replied it meant "[t]o tell the truth." She then confirmed she felt ready to tell the truth.

Following this examination, the trial court announced it was satisfied that K.V. qualified as being competent to testify. Defense counsel then requested an opportunity to ask a few questions of K.V. about her competency, but the trial court denied the request. The trial court also noted that issues being raised by defense counsel were related to K.V.'s credibility and reliability, but not her competence. Defense counsel asserted that a witness's competency also involved an inquiry into an ability to recall past events and report them intelligibly. Consequently, defense counsel asserted the court's inquiry had been insufficient to satisfy those aspects of the necessary inquiry. Responding, the court noted the objection and asked for the jury to be brought back into the courtroom.

On direct examination, K.V. testified she was nine years old and attending the third grade. K.V. testified that when she lived with Mendez he was "mean," that he used to hit her with a belt "[a]ll over [her] body," and that he would force her and her brothers to "sit on the wall." When

12

asked if she remembered the day that I.V. had died, she responded "Yes." When asked what had happened, K.V. answered "[Mendez] saw [I.V.] poop and pee in his pants so he grabbed him. He didn't realize it, [I.V.], and he started to spank him and do stuff to him." Asked to explain, she added, "He – he punched him in the stomach." K.V. further described I.V. as being "on the floor," and she did not see him get up.

When asked details about what she was doing while this was happening, K.V. testified, "I forgot." When her mother arrived home, K.V. described that her mother tried to give I.V. CPR. The State showed K.V. photographs of her taken at the CAC which showed a bruise on her chin. K.V. testified that Mendez caused the bruise, but she could not remember what had happened. K.V. said she remembered talking to a person in a room with a rainbow and a pot of gold.

On cross-examination, K.V. testified she had spoken to prosecutors twice before she gave her testimony. When asked to recount who she had talked with about "what happened back then," she mentioned her brother J.R. and her grandmother. K.V. stated that it had been about six years since I.V. died. K.V. recalled the day she was interviewed at the CAC, but she did not remember the answers she gave during the interview. Defense counsel then asked, "You don't remember that you told the person that you were talking to, that your—that [Mendez] kicked your little brother?" K.V. responded, "Yes." Counsel then asked, "Did [Mendez] kick your little brother?" K.V. answered, "No." When asked why she told the interviewer that had happened, she replied that she did not know. Defense counsel asked whether she remembered being asked at the CAC whether she "saw it with her own eyes," and K.V. responded that she remembered being asked that question and she said she had seen it happen. She did not remember responding "no" to that question. She remembered she was wearing "a black sleeve with black pants and then boots" the

13

day I.V. died. K.V. stated that she had seen Mendez get angry at I.V. when he "pooped in his pants," and that he would spank him for doing so. On redirect examination, K.V. stated that Mendez would "spank" I.V. on his buttocks with a belt, but not anywhere else on his body. She also identified Mendez in the courtroom and described that "he's wearing a white suit with a tie."

*Applicable Law and Analysis*

A trial court's determination of a witness's competency to testify is reviewed for abuse of discretion. *Broussard v. State*, 910 S.W.2d 952, 960 (Tex. Crim. App. 1995). A trial court abuses its discretion when its ruling falls outside the zone of reasonable disagreement, or if its decision was unreasonable or arbitrary. *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1990) (op. on reh'g).

Texas Rule of Evidence 601 governs the issue of whether a child is competent to testify. It states that while every witness is presumed competent to testify, "[a] child . . . whom the court examines and finds lacks sufficient intellect to testify concerning the matters in issue" is incompetent to testify. TEX. R. EVID. 601(a)(2). Competency to testify is a preliminary question for the trial court to determine under Rule 104(a), and the trial court is not bound by the rules of evidence in making a competency determination. TEX. R. EVID. 104(a); *Gilley v. State*, 418 S.W.3d 114, 121 (Tex. Crim. App. 2014). As the State points out, the trial court may allow parties to participate in a competency determination, but it is not required to do so if it makes an independent decision based on all the evidence before it. *Gilley*, 418 S.W.3d at 121.

The party raising competence as an issue bears the burden of proving a witness is not competent to testify. *Id*. at 120. When a party challenges the competency of a child witness, the trial court must consider three elements: (1) the competence of the child to observe intelligently

the events in question at the time of the occurrence; (2) the capacity of the witness to recollect the events; and (3) the capacity of the witness to narrate the facts (that is, the ability to understand the questions asked, to be able to frame intelligent answers to those questions, and to be able to understand the moral responsibility to tell the truth). *Ortiz v. State*, No. 08-02-00203-CR, 2003 WL 22413644, at *2 (Tex. App.—El Paso Oct. 23, 2003, no pet.) (not designated for publication) (citing *Watson v. State*, 596 S.W.2d 867, 870 (Tex. Crim. App. 1980)).

We consider the child witness's responses to qualification questions and the child's entire testimony in reviewing the trial court's ruling. *Baldit v. State*, 522 S.W.3d 753, 761 (Tex. App.—Houston [1st Dist.] 2017, no pet.) (citing *Davis v. State*, 268 S.W.3d 683, 699 (Tex. App.—Fort Worth 2008, pet. ref'd)). Absent a lack of any of these three abilities, a child witness is presumed competent to testify. *See* TEX. R. EVID. 601(a)(2). On the other hand, competency is not determined by the existence of inconsistencies and conflicts in the child's testimony; rather, they are simply factors affecting the weight of a child's credibility. *A.R.S. v. State*, No. 14-00-00237-CV, 2001 WL 930806, at *4 (Tex. App.—Houston [14th Dist.] Aug. 16, 2001, no pet.) (not designated for publication) (citing *Woods v. State*, 14 S.W.3d 445, 450 (Tex. App.—Fort Worth 2000, no pet.)).

On appeal, Mendez argues that the trial court erred when it did not permit an inquiry by defense counsel into K.V.'s competency during her testimony before the jury. He also argues that the trial court erred by failing to make an inquiry into K.V.'s ability to reliably recall and report past events from memory. In sum, Mendez asserts the trial court erred by not permitting defense counsel to examine K.V. on the issue of her competency to testify, or to present Dr. Wood's testimony on that question, and these errors, in combination, resulted in harm.

15

The State counters that the trial court is not required to consider expert testimony, nor required to permit personal participation in a competency examination, before the court decides that a child witness is competent to testify. The State contends that the trial court is given discretion to allow the parties to participate in such examination, but is not required to do so, citing *Gilley v. State*, 418 S.W.3d 114, 121 (Tex. Crim. App. 2014) for that proposition. It further argues that Mendez has failed to demonstrate that the trial court's chosen procedure in conducting K.V.'s competency evaluation resulted in the presentation of an incompetent witness's testimony at trial, and that the error, if any, by the trial court was harmless because there is no evidence in the record suggesting that K.V. was incompetent.

Here, the trial court refused to allow defense counsel to directly participate in K.V.'s competency examination, and it instead undertook the task of conducting the examination itself. Yet, as the State points out, the trial court has the discretion to allow parties to participate in a competency examination, but the trial court is not required to do so if it makes an independent ruling on competency based on its own questioning. *See Gilley*, 418 S.W.3d at 121 (citing TEX. R. EVID. 601(a)(2)). Mendez directs us to no authority requiring a trial court to consider proffered expert testimony before determining the competency of a witness, and we find none standing for that proposition. Instead, he concedes that a trial court may permit the parties to participate in a competency examination but is not required to do so. Since the record shows that the trial court determined K.V. to be competent based on its own inquiries, and because the trial court is not required to allow parties to participate in a competency examination, we find that no abuse of discretion occurred when the trial court denied defense counsel's request to directly participate in K.V.'s competency examination or to consider Dr. Wood's proffered testimony on the matter

16

before making its decision. *See id.*

Next, we must consider whether the trial court erred by declining to inquire into K.V.'s ability to recall and report past events about which she was asked to testify, i.e., the events taking place at the apartment on the day of I.V.'s death. *See Ortiz*, 2003 WL 22413644, at *2. As previously stated, the trial court asked questions regarding K.V.'s ability to appreciate the difference between the truth and a lie, and she properly responded to the court's inquiry. The court also asked for her to explain what it meant for her to raise her hand and take an oath. K.V. not only responded that she knew it meant for her to tell the truth, she also stated she felt ready to do so. The trial court, however, did not make a direct inquiry into whether K.V. could recall the relevant events before declaring her competent to testify. On review, however, we consider the trial court's competency evaluation *and* K.V.'s testimony at trial in determining whether the trial court abused its discretion in finding her competent. *See Baldit*, 522 S.W.3d at 761; *see also Davis*, 268 S.W.3d at 699–700 (we consider the witness's answers to the trial court's qualification questions and her testimony as a whole when determining whether the trial court abused its discretion in finding the witness competent to testify), *accord Hernandez v. State*, No. 02-14-00262-CR, 2016 WL 4903206, at *6 (Tex. App.—Fort Worth Sept. 15, 2016, pet. ref'd) (mem. op., not designated for publication).

Upon review of the trial court's competency evaluation and K.V.'s testimony, we find that the trial court did not abuse its discretion in finding her competent to testify. K.V.'s testimony aptly showed that she possessed the ability to observe the events in question at the time of the occurrence and was capable of recollecting the events. For example, K.V. testified that she remembered Mendez hitting her with a belt and making her and her brothers "sit on the wall."

17

She further testified that she remembered the day that I.V. died. She described that Mendez saw that I.V. had "poop" and "pee" in his pants, so Mendez grabbed him and started to spank him. She also said that Mendez punched I.V. in the stomach.

On review, the record shows that K.V. freely admitted that she did not remember certain events or details about events, suggesting that she understood the difference between a truth and a lie and the importance of telling the truth. Although her testimony somewhat contradicted statements she had made prior during her interview at the CAC, this fact alone is not enough to render a child witness incompetent to testify; rather, these inconsistencies merely had bearing on her credibility, or the weight given her testimony. *See Hogan v. State*, 440 S.W.3d 211, 216 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd); *Watson*, 596 S.W.2d at 870; *Allen v. State*, 479 S.W.2d 278, 280 (Tex. Crim. App. 1972).

The record further shows on review that K.V. responded intelligibly to questions from the trial court, the State, and defense counsel. As such, she demonstrated that she had the ability to observe, recollect, and intelligibly report the events at the time I.V. died. *See Hogan*, 440 S.W.3d at 216-17 (witness with moderate mental retardation sufficiently demonstrated the ability to recall and report relevant events where she testified that the defendant tied her to his bed with sheets, that she told him to get off her, and that he penetrated her and caused her pain); *Baldit*, 522 S.W.3d at 763–64. Likewise, K.V. articulated a response to the trial court's inquiry regarding whether she knew the difference between the truth and a lie, and when asked she gave an acceptable example of the distinction. When asked whether she was prepared to tell the truth in her testimony, she responded affirmatively. Further, any implication that her testimony was influenced by suggestive interview techniques or by other means is a matter related to her

credibility as a witness, not her competency to testify. *See Baldit,* 522 S.W.3d at 763. Finally, K.V.'s young age does not raise a presumption of incompetence, and there is no precise age under which children are deemed incompetent to testify. *Id.* at 763–64.

*Conclusion*

Based on the foregoing, we conclude that the trial court did not abuse its discretion in finding K.V. competent to testify, such that its decision fell outside the zone of reasonable disagreement. As such, we decline to disturb its ruling on the matter. *See id.* at 762-64 (six-year-old witness was competent to testify where she was able to (1) state her name, age, her grade, the school she attended; (2) recall the events related to the commission of the offense and articulate her recollection of the events; (3) respond intelligibly to questions from the trial court and the parties; and (4) articulate the difference between a truth and a lie, and appreciate the importance of telling the truth); *Woods,* 14 S.W.3d at 451 (trial court did not abuse its discretion in finding a child witness competent where the child appreciated the difference between a truth and a lie, where the prosecutor asked the child questions to determine whether he was able to accurately perceive the events of the alleged crime, and where the child was able to articulate his perceptions in a reliable manner); *Davis,* 268 S.W.3d at 699–700 (trial court did not abuse its discretion in failing to ask child witness about the punishment for not telling the truth where the child's testimony established her ability to intelligently observe the events associated with the charged offense and recollect and narrate them, as well as her stated appreciation of the difference between a truth and a lie and that she was going to tell the truth in her testimony).

**Exclusion of Dr. Wood's Testimony**

*Dr. Wood's Proffered Testimony*

19

We now address whether the trial court abused its discretion by excluding testimony from Dr. James Wood, a clinical psychologist proffered by Mendez. During the State's case-in-chief, defense counsel raised the issue of K.V.'s competency,[4] arguing that the trial court had a duty to make an inquiry into her competency prior to allowing her to testify. In a bench conference outside the presence of the jury, defense counsel expressed his desire to call Dr. Wood to testify as an expert on the matter of K.V.'s competency, although defense counsel admitted that the "Rules of Evidence don't describe how that inquiry specifically should be made[.]" Defense counsel stated that he intended on calling Dr. Wood to explain that children are generally unable to reliably testify from memory about events they observed or might have observed prior to the age of five. Defense counsel further stated that this inquiry did not implicate K.V.'s credibility or veracity, but rather, only implicated her capacity to tell the truth, and his testimony would be helpful to the jury in determining whether K.V. was capable of reliably remembering the events about which she had testified. Defense counsel also expressed his desire to present Dr. Wood's testimony to establish the susceptibility of young children to suggestive questioning, to show that the CAC interview was not conducted according to the proper standards that research demonstrated were necessary to obtain reliable information from children, and to establish whether any techniques used in the interview proved suggestible in a way that might have affected the reliability of K.V.'s testimony in court.

The State responded that defense counsel had an opportunity to cross-examine K.V. to bring out issues about her memory and the jury could judge her credibility from that examination.

---

[4] Mendez filed a pretrial motion seeking a ruling from the court that K.V. was not competent to testify at trial. The trial court did not rule on the motion prior to trial.

The State also argued that the forensic interview was not introduced into evidence so any expert testimony about alleged suggestibility in the interview would not be relevant. The State also argued that Dr. Wood had not interviewed K.V. recently and it would be improper for him to comment on her testimony in court. Thus, the State contended that the issue before the trial court was not whether K.V. was competent to testify when she was interviewed at the CAC, but rather whether she was competent at the time of trial. The State also argued that Dr. Wood's testimony would be irrelevant because his opinion would not afford the jury with expertise that it did not already possess, and that his opinion regarding the CAC interview would be irrelevant because the interview was not in evidence.

The trial court ultimately excluded Dr. Wood's testimony reasoning that an expert was not needed to determine K.V.'s competency. Rather, the court asserted it would make the determination itself by exercising its discretion. The trial court also expressed concern that allowing Dr. Wood to opine on K.V.'s credibility would be improper, and that a witness's capacity for memory was "inextricably intertwined" with the witness's veracity and credibility. The trial court further noted that K.V. testified that she remembered some things, but not others, and that it was the jury's responsibility to assign weight to her credibility.

Defense counsel subsequently argued that Dr. Wood would have testified that "among other things, that a person, including an older child, is incapable of reliably testifying about any matters that the child witnessed before the child was—reached the age of 5. And that—that opinion is uncontroversial in the field." During the proffer outside the presence of the jury, Dr. Wood testified that research in the field of psychology established that adults and older children are unable to reliably remember events occurring prior to age five. Dr. Wood also stated that this

21

"infantile amnesia" could be expected in a child nine years of age who was asked to recall events occurring before she reached the age of five. Dr. Wood further testified that children are susceptible to the creation of false memories through suggestive questioning or other inadequate interview methods, citing several accepted psychological studies for that proposition.

Finally, outside the presence of the jury, Dr. Wood testified that he noticed several instances of suggestive and inadequate interview techniques which occurred when K.V. was interviewed at the CAC. Particularly, he noted that K.V.'s interviewer asked her seven questions that assumed that she had seen Mendez kick I.V., even though she had said otherwise. Dr. Wood also noted that the interviewer introduced the words "killed" and "mean" and connected those words with Mendez, even though K.V. had used the word "died" when she had described what had happened to I.V. and denied that anyone was mean to her or her brothers. Finally, Dr. Wood noted that the interviewer did not attempt to clarify the difference between "kicked" and "died," and concluded that this questioning had the potential to create false memories for K.V., especially if those memories were reinforced in the intervening years.

Following Dr. Wood's proffer, the trial court reiterated its decision to exclude Dr. Wood's testimony. The trial court reasoned that (1) the substance of K.V.'s testimony was consistent with what she told the interviewer during the CAC interview, and that the scope of her questioning at trial was narrow and covered only a few issues, and (2) while appreciating the risks associated with accusations made by individuals with false memories, Dr. Wood's testimony would not be helpful to the jury and would have the opposite effect of "entering into a world of confusion . . . [which was not] warranted in this case." The trial court also noted that there were no prior inconsistent statements which were elicited during K.V.'s cross-examination testimony.

22

*Applicable Law*

A trial court's decision to admit or exclude evidence, including proffered expert testimony, is reviewed under the same abuse of discretion standard set forth above. *Weatherred v. State*, 15 S.W.3d 540, 542 (Tex. Crim. App. 2000). In determining whether the trial court abused its discretion in making evidentiary decisions, including the exclusion of evidence, we do not substitute our judgment for that of the trial court because the trial court is in a superior position to evaluate the impact of the evidence. *Montgomery,* 810 S.W.2d at 379. If the record supports the trial court's decision on the admission or exclusion of evidence, there is no abuse of discretion and the trial court's decision should be upheld. *Osbourn v. State*, 92 S.W.3d 531, 537 (Tex. Crim. App. 2002). If the trial court's ruling on an evidentiary issue is correct under any theory of law applicable to the case, we must uphold its decision even if the trial court articulates a different, and/or incorrect, basis for its ruling. *Ukwuachu v. State*, No. PD-0366-17, 2018 WL 2711167, at *7 (Tex. Crim. App. June 6, 2018) (not designated for publication) (citing *Romero v. State*, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990)).

The Texas Rules of Evidence govern the admissibility of expert witness testimony. First, Texas Rule of Evidence 104(a) requires the court to decide any preliminary question about whether a witness is qualified. TEX. R. EVID. 104(a). Expert testimony must also meet the requirements laid out in Rule 702. *See* TEX. R. EVID. 702. Rule 702 requires a trial court to consider at least three inquiries before admitting expert testimony: (1) whether a witness is qualified as an expert by reason of knowledge, skill, experience, training, or education; (2) whether the subject matter of the testimony is an appropriate one for expert testimony; and (3) whether the expert testimony actually assists the fact finder in deciding the case. *See id.*; *Vela v. State,* 209 S.W.3d 128, 131

23

(Tex. Crim. App. 2006). "These conditions are commonly referred to as (1) qualification, (2) reliability, and (3) relevance." *Vela,* 209 S.W.3d at 131.

Assuming expert testimony regarding the memory of certain classes of witnesses satisfies Rule 702, there is another hurdle such testimony must overcome to be admissible. In *Schutz v. State*, the Court of Criminal Appeals recognized that some witnesses are viewed by society as "impaired" due to a condition or disability embodied by all persons who belong to their class. *Schutz v. State*, 957 S.W.2d 52, 70 (Tex. Crim. App. 1997). Examples of this phenomenon includes young children and persons who are mentally challenged. *Id*. *Shutz* provides that "[w]hen an 'impaired' witness or declarant is expected to testify, expert testimony should be permitted in the offering party's case-in-chief concerning the ability of the *class* of persons suffering the 'impairment' to distinguish reality from fantasy and to perceive, remember, and relate the kinds of events at issue in the case." *Id*. (emphasis in original). Such "impaired class" testimony is admissible, provided that: (1) the testimony is limited to a discussion of the *class*, rather than an *individual* witness; and (2) "should focus on the *ability* of the class to accurately perceive, remember, etc. rather than any *tendency* to do so." *Id*. at 70 (emphasis in original). Expert testimony which does not satisfy these two requirements is inadmissible. *Id*.

Likewise, the Court also reiterated the rule that an expert's testimony that an *individual* witness's testimony is the product of manipulation or suggestive interview techniques is an impermissible comment on that witness's credibility; such testimony is also inadmissible. *Id*. (citing *Yount v. State*, 872 S.W.2d 706, 711–12 (Tex. Crim. App. 1993)). The Court stated that such testimony does not aid a jury in its decision making, but rather, it results in an inappropriate replacement of the jury's decision regarding a witness's credibility. *Id*. at 59 (citing *Duckett v.*

24

*State*, 797 S.W.2d 906, 914 (Tex. Crim. App. 1990)). As such, expert testimony does not assist the jury and is inadmissible if it constitutes a "direct opinion on the truthfulness" of a witness's testimony. *Id*. (citing *Yount*, 872 S.W.2d at 708).

*Analysis*

On appeal, Mendez argues that the trial court erred by excluding Dr. Wood's testimony regarding psychological research on children's susceptibility to suggestive or improper interrogation techniques, such as the risk that false memories could be implanted, and that people younger than five years of age do not have reliable memories of events in general. In particular, Mendez argues that Dr. Wood's testimony was not offered to prove that K.V. was not truthful or had fantasized her testimony, or that she lacked the capacity to tell the truth; instead, he states that Dr. Wood's testimony was offered to inform the jury that "with few exceptions, people above the age of five years do not have reliable memories of events that occurred prior to the age of five, and that he would expect to find this 'infantile amnesia' [in] a child nine years of age who was asked to testify about events that occurred before she reached the age of five." Citing *Schutz*, he argues that Dr. Wood's testimony would have shown that a class of persons, rather than K.V. as an individual witness, generally lack the ability to perceive, remember, and testify about events at issue in the case. *See Schutz,* 957 S.W.2d at 70 (testimony related to an "impaired" witness theory must be limited to a discussion of the impaired class rather than the individual witness, and should focus on the ability, rather than the tendency, of the class to accurately perceive and remember past events). He also argues that Dr. Wood's testimony would have been helpful to the jury in explaining whether suggestive interview techniques were used during the CAC interview, and that the jury could have used his testimony along with their common sense in determining whether the

25

alleged suggestive interview practices had affected her memory of recent events. As such, Mendez contends that Dr. Wood's testimony would not have supplanted the jury's responsibility of determining K.V.'s credibility, but instead it would only have provided additional specialized knowledge to assist the jury in its task.

Responding to Mendez's contentions regarding the exclusion of Dr. Wood's testimony, the State argues that the trial court could have properly excluded Dr. Wood's testimony because it did not meet the qualification, reliability, or relevance requirements for expert testimony under Rule 702. The State also argues that Dr. Wood's testimony would have amounted to an impermissible result-of-manipulation or impaired-class opinion regarding K.V.'s testimony because Dr. Wood would have testified that the substance of K.V.'s testimony was implanted in her mind through suggestive interview techniques, also relying on *Schutz* for that proposition. The State also argues that even if the trial court erred by excluding Dr. Wood's testimony, its action did not result in harm because defense counsel was able to impeach K.V. with her inconsistent statements during cross-examination. Likewise, the State contends any error was harmless because the State presented other strong evidence of Mendez's guilt, such as (1) the medical evidence establishing I.V.'s cause of death; (2) evidence of Mendez's consciousness of guilt, such as his statements that he "went . . . overboard" and had to "pay for what he did," as established by recorded interviews; and (3) testimony from Villanueva which showed that Mendez was the only adult present when I.V. died, and from both Villanueva and J.R. that Mendez had a history of committing physical abuse toward Villanueva's children.

The record shows that during the defense's proffer, the trial court and Dr. Wood engaged in the following colloquy:

26

The Court: . . . I guess the main issue is this: If [K.V.] testified here that she never saw [Mendez] kick [I.V.], and during that interview she never acquiesced to the suggestion that [Mendez] kicked [I.V.], doesn't that to you suggest that in fact she was not suggestible?

[Dr. Wood]: Within that—she was not suggestible when? Now or—

The Court: Ever—then or now. I mean, she didn't acquiesce then and with the passage of time, she has not acquiesced to the notion that that is what happened.

[Dr. Wood]: Okay. So does that mean a general thing about her suggestibility or about that fact?

The Court: Both.

[Dr. Wood]: As far as the general, I would need to know more about what she's saying about that event . . . a more general thing about her suggestibility. If she testified now that she—that [Mendez] did not kick [I.V.], she said that now, then I would say, yes, on that fact, Zimmerly's suggestive questioning did not alter—seem to have altered her memory. Is [that] what you're after?

The Court: Yes.

[Dr. Wood]: Yes. So that's right. For that particular memory. Right. The main thing—maybe if I could give you the general principle, is that I think it's highly unlikely that any child—whatever she is, like 9 years now or 8 years old— that she can remember what happened when she was 4; that she has a memory. That's infantile amnesia. It's possible, but it's pretty remote. And my principle is generally to look at what they said right now. And . . . that gives you the best record of what she was doing. So I don't—I would not say that even when she has a memory for the event now in the source—the real source of information, which I realize presents legal problems, but the real source of information is what she said to Max Zimmerly that afternoon.

Following Dr. Wood's proffer, the trial court reiterated its decision to exclude Dr. Wood's testimony. The trial court reasoned that (1) the substance of K.V.'s testimony was consistent with her CAC interview, and that the scope of her questioning at trial was narrow and covered only a few issues, and (2) while appreciating the risks associated with accusations made by individuals with false memories, Dr. Wood's testimony would not be helpful to the jury and would have the

27

opposite effect of "entering into a world of confusion . . . [which was not] warranted in this case[,]" and was a comment on K.V.'s credibility.

Citing *Schutz*, the State argues that these statements by Dr. Wood amount to an inadmissible opinion on K.V.'s credibility, since Dr. Wood essentially opined that K.V.'s testimony resulted from implantation of a false memory through suggestive interview techniques used during the CAC interview. *See Schutz*, 957 S.W.2d at 59-60. It also argues that Dr. Wood's testimony amounted to an improper impaired-class opinion under *Schutz* because (1) his testimony addressed an individual witness's (K.V.'s) ability to perceive, remember, and relate the kind of events at issue; (2) Dr. Wood's testimony impermissibly focused on the *tendency* of a class of persons to accurately perceive or remember events, as opposed to the class's *ability* to do so. *See id*. at 70.

We agree that the trial court's exclusion of Dr. Wood's testimony under the *Schutz* rule fell within the zone of reasonable disagreement and did not amount to an abuse of discretion. Regarding the first inquiry promulgated by *Schutz*, Dr. Wood testified that he thought it was "highly unlikely" that any child, including a nine year old, can remember what occurred when she was four years old, describing this phenomenon as "infantile amnesia." Dr. Wood went on to state that

> [His] principle is generally to look at what [the child witness] said right now. And that . . . gives you the best record of what she was doing. So I don't—I would not say that even when she has a memory for the event now in the source—the real source of information, which I realize presents legal problems, but the real source of information is what she said to Max Zimmerly that afternoon.

We find this statement—particularly, Dr. Wood's testimony that the "real source" of K.V.'s testimony was "what she said to Max Zimmerly [during the CAC interview]"—to amount to an

28

impermissible comment that K.V.'s testimony that Mendez punched I.V. was the result of implantation through suggestive interview techniques or manipulation used by Zimmerly during the CAC interview. *See id.* at 60. Dr. Wood's testimony was not a proper discussion regarding a class of persons, such as young children; rather, it amounted to a discussion of an individual witness's (K.V.'s) ability to accurately perceive, remember, and recall past events. Under *Schutz* and related cases, this type of opinion is unhelpful to the jury and amounts to an impermissible replacement of the jury's assessment of K.V.'s credibility with Dr. Wood's own opinion regarding her credibility. *See id*; *Yount*, 872 S.W.2d at 708. As such, the trial court did not abuse its discretion in excluding Dr. Wood's testimony on this ground. *See Schutz*, 957 S.W.2d at 70; *see also Contreras v. State*, No. 08-06-00205-CR, 2009 WL 50601,at *3–4 (Tex. App.—El Paso Jan. 8, 2009) (not designated for publication), *overruled on other grounds*, 312 S.W.3d 566 (Tex. Crim. App. 2010) (trial court did not abuse its discretion in excluding expert witness's proffered testimony that interrogation techniques may have affected the defendant's confession).

We also find the trial court did not abuse its discretion in excluding Dr. Wood's testimony under the second inquiry promulgated in *Schutz*, i.e., that expert testimony should not comment on the *tendency* of a class of people to accurately perceive, recall, and relate past events, but that such testimony should only focus on the *ability* of the class to do so. *See Schutz,* 957 S.W.2d at 70 (emphasis added). Dr. Wood's testimony contained several instances commenting on the general tendency of children to fail to recall certain events, or to recall them inaccurately. For example, Dr. Wood testified that while K.V. might have remembered what occurred on the day of I.V.'s death, she would not remember those events a year or two later. Dr. Wood also stated that it was "highly unlikely" that K.V. had any true memory of the events and that any source of her memory

29

would be from her CAC interview, and not her own memory.  Further, Dr. Wood testified that while people may believe that they remember events occurring before five years of age, these individuals "turn[] out to be totally wrong or 90 percent wrong" about their memories of these events; this amounts to an inadmissible comment on the tendency, rather than the ability, of the impaired class to perceive, recall, and relate past events.  *See Schutz,* 957 S.W.2d at 70; *see also Barshaw*, 342 S.W.3d at 92, 94–95 (expert's testimony that persons with mental retardation "could be painfully honest" was inadmissible opinion on the general tendency of impaired class, rather than their ability, to be honest).

*Conclusion*

In sum, we conclude that the trial court did not abuse its discretion in excluding Dr. Wood's testimony based on it being an impermissible comment on K.V.'s credibility, as well as it being an inadmissible opinion that K.V.'s testimony resulted from manipulation or suggestive interview techniques.  *See Schutz*, 957 S.W.2d at 70.  Moreover, Dr. Wood's testimony was inadmissible because it focused on K.V.'s capacity to perceive, recall, and relate past events, individually, rather than as a member of an impaired class.  *See id*.  Finally, the trial court did not abuse its discretion in excluding Dr. Wood's testimony based on concerns that it impermissibly commented on the general tendency, as opposed to the ability, of children to perceive, recall, and relate past events occurring before the age of five. We therefore find that the trial court's decision to exclude Dr. Wood's testimony fell within the zone of reasonable disagreement, and we will not disturb it on appeal.[5]   Issues One and Two are overruled.

---

[5] The trial court excluded Dr. Wood's testimony because (1) the substance of K.V.'s interview statements was consistent with her testimony, and (2) because Dr. Wood's testimony would have confused the jury, and ran the risk of supplanting its determination of K.V.'s credibility with Dr. Wood's opinion on the matter.   As such, the trial court

30

**Exclusion of CAC Interview**

In Issues Three and Four, Mendez argues that the trial court erred in excluding the video recording of K.V.'s interview at the CAC. Particularly, he contends the recording was admissible for two purposes: (1) as a prior-recollection-recorded exception to the hearsay rule; and (2) to impeach parts of K.V.'s testimony with prior inconsistent statements.

**CAC Interview with K.V.**

On the afternoon of the day I.V. died, four-year-old K.V. was interviewed at the CAC by Max Zimmerly. K.V. told Zimmerly that I.V. was "with the police . . . [and] him died." K.V. said that "[she] saw him died," and that "[Mendez] kicked him right here [gesturing to her torso] and him died." K.V. said that afterwards, Mendez was saying, "Wake up, [I.V.]!" K.V. mentioned she was at Joe's house. She said her mother was at work and her brother, J.R., was at school. Asked whether she saw Mendez kick I.V. with her eyes, she said "no." When Zimmerly followed by asking, "how do you know [Mendez] kicked [I.V.]," she responded, "because I know him." Zimmerly said tell me everything. K.V. said "[Mendez] kicked him, him pooped in the pants and him peed." Next, she said, "[Mendez] put him sitting down on the wall." Then she said, "him died and the police got him." When Zimmerly asked, "the police got who?" She responded "[I.V.]."

Later in the interview, K.V. repeated that Mendez "kicked [I.V. and] he died." K.V. stated that I.V. died in the "restroom." She also stated that she saw Mendez carry I.V. into the restroom. When asked what happened first, K.V. said "him died." K.V. told Zimmerly that Mendez cleaned

---

did not rely on *Schutz* and related cases in excluding Dr. Wood's testimony; nevertheless, we may uphold its ruling under any theory of law applicable to the case, even if the trial court did not rely on that theory in making its ruling. *See Ukwuachu*, 2018 WL 2711167, at *7.

up "poop" from the floor with a sock.   When Zimmerly asked when I.V. was kicked, K.V. simply shrugged.   She also said that I.V. "got kicked when him peed."

At trial, K.V. testified on direct examination that Mendez "punched [I.V.] in the stomach." After the conclusion of the State's case-in-chief, the defense announced its intent to introduce the video recording of the CAC interview, and that it was admissible because it fell within the prior-recollection-recorded exception to the hearsay rule.   The defense also argued that the recording was admissible for impeachment of K.V.'s testimony with prior inconsistent statements made during the interview, i.e., that Mendez had kicked I.V. in the chest (as opposed to her testimony at trial that Mendez punched I.V. in the stomach).

Although the State objected to the admission of the recording, the State asserted that defense counsel could use it to refresh K.V.'s recollection when needed.   Responding, Mendez requested the trial court admit the entire recording under the prior-recollection-recorded exception but additionally conceded it would need to be redacted to contain only those statements which were allegedly inconsistent with K.V.'s trial testimony for it to be admissible for impeachment purposes.   Defense counsel admitted that it "may be the case that not the entire video is admissible[,]" and with regard to which portions of the recording he wanted to be admitted, he stated "[s]uch parts [from the recording] as—are admissible for either of the reasons I have articulated[.]"   The trial court reviewed the recording, and having found that no inconsistent statements existed, it later refused to admit the recording.

*Applicable Law and Analysis*

The trial court's exclusion of evidence is reviewed under the same abuse of discretion standard set forth above.   *Willover v. State*, 70 S.W.3d 841, 847 (Tex. Crim. App. 2002);

32

*Montgomery,* 810 S.W.2d at 379. As a preliminary matter, we first address the State's argument that Mendez did not sufficiently identify which portions of the recording he wanted the trial court to admit, and that the trial court did not abuse its discretion in excluding the entirety of the recording when Mendez failed to do so. The record shows that during a bench conference on the issue of admitting the CAC interview, defense counsel stated, "[s]uch parts as—are admissible for either of the reasons I have articulated, I would want to have it come in." In his reply brief, Mendez argues that the trial court took it upon itself to review the entirety of the recording, and that his proffer was sufficient to identify the location of the inconsistent statements contained in the video recording.

To determine whether the trial court could have properly excluded the recording, we must first determine whether the recording contains both admissible and inadmissible statements. *See Willover*, 70 S.W.3d at 846–47 (considering whether a recording contained both admissible and inadmissible statements as a predicate to determining whether the proponent of the recording sufficiently identified which portions he wanted to be admitted). When a party intends to offer hearsay evidence for the purposes of impeachment, but it fails to segregate or specify which portions he wishes to offer, the entirety of the video recording must be admissible not only under the relevant hearsay rules, but also under the other rules of evidence, such as the requirement that the statements be relevant. *Id*. at 846 n.9. Our review of the recording shows that some statements made by the interviewer and K.V. in the recording were admissible under the rules of evidence, and some were not. As such, it was reasonable for the trial court to conclude that Mendez was attempting to introduce a recording containing both admissible and inadmissible evidence. *See id*. at 846–47.

33

Having determined that the CAC interview contained both admissible and inadmissible statements, we find that Mendez did not sufficiently identify which portions of the recording he wanted to be admitted. The burden to identify which portions of a recording are admissible and which are not, falls upon Mendez, the proponent of the evidence, and not the trial court. *See id.* at 847; *Khoshayand v. State*, 179 S.W.3d 779, 784 (Tex. App.—Dallas 2005, no pet.) (citing *Jones v. State*, 843 S.W.2d 487, 492–93 (Tex. Crim. App. 1992), *abrogated on other grounds by Maxwell v. State*, 48 S.W.3d 196 (Tex. Crim. App. 2001)). We find that defense counsel's request that the trial court admit "[s]uch parts [from the recording] as—are admissible for either of the reasons I have articulated" was insufficient to satisfy the responsibility to segregate the portions of the interview which were admissible.

As such, because Mendez did not sufficiently segregate and offer the admissible portions of the CAC interview, the trial court did not abuse its discretion in excluding the entirety of the recording. *See Willover*, 70 S.W.3d at 847 (where the proponent did not identify specific statements with which it intended to impeach a witness, trial court properly excluded video recordings offered in their entirety because it could have reasonably concluded that video recordings contained both admissible and inadmissible evidence); *Jones*, 843 S.W.2d at 492–93 ("If evidence is offered and challenged which contains [both admissible and inadmissible evidence], the trial court may safely admit it all or exclude it all, and the losing party . . . will be made to suffer on appeal the consequences of his insufficiently specific offer or objection."); *Khoshayand*, 179 S.W.3d at 784 (trial court did not abuse its discretion in excluding entirety of investigator's notes where the notes contained both admissible and inadmissible statements, and where the proponent failed to segregate and specifically offer the admissible statements).

34

Even if the trial court erred by excluding the CAC video, we find that any error was nonetheless harmless. *See* TEX. R. APP. P. 44.2(b) (we must disregard errors not affecting a defendant's substantial rights); *see also Potier v. State*, 68 S.W.3d 657, 666 (Tex. Crim. App. 2002) (we apply harmless error analysis to trial court's exclusion of evidence not amounting to an arbitrary or unjustified limitation on an accused's right to defend). Mendez was able to impeach K.V. during cross-examination with her inconsistent statements made during the CAC interview, and the substance of what she said in her interview was therefore presented to the jury. K.V. admitted that she had told the interviewer that Mendez had kicked I.V., which was inconsistent with her testimony that Mendez had punched I.V. and testified on cross-examination that she did not know why she had said so. As such, K.V.'s statements in the CAC interview would have been cumulative of her testimony at trial as she openly admitted that she testified in a manner inconsistent with her prior statement. *See In re E.A.G.*, 373 S.W.3d 129, 147 (Tex. App.—San Antonio 2012, pet. denied) (trial court correctly excluded videotaped interview of child witness where the witness had already been impeached and made a recantation of her outcry at trial, reasoning that admission of the interview would not have added anything more to impeach her); *see also McGary v. State*, 750 S.W.2d 782, 787 (Tex. Crim. App. 1988) ("[w]hen the contradictions are confessed, evidently there is no use or purpose for the impeaching testimony [since] for this work [the witness] performs upon himself," and if the witness admits the inconsistent remarks then the prior inconsistent statement is inadmissible). As such, even if the trial court erred by excluding the CAC interview, we find that any error was harmless. *See* TEX. R. APP. P. 44.2(b); *In re E.A.G.*, 373 S.W.3d at 147; *McGary*, 750 S.W.2d at 787. Issues Three and Four are overruled.

35

## Admission of K.V.'s Statement to Law Enforcement

In Issue Five, Mendez argues that the trial court erred by admitting K.V.'s out-of-court statement to law enforcement that Mendez had kicked I.V., specifically in regard to references made to K.V.'s statement during both the recorded interview of Mendez and Villanueva, and the recorded interview of Mendez when questioned by Detective Samaniego. Mendez asserts that K.V.'s out-of-court statement amounted to hearsay and its probative value was outweighed by the risk of unfair prejudice in violation of TEX. R. EVID. 403.

### Trial Events

At trial, the State offered, and the trial court admitted the recorded conversation between Mendez and Villanueva, during which Villanueva stated that "[t]hey told me that supposedly you kicked [I.V.] in the stomach." After the recording and the transcript of the recording was published to the jury, defense counsel objected on the grounds of hearsay and unfair prejudice to any further references to K.V.'s statement that Mendez had kicked I.V., including references to the statement made in the recorded interview between Detective Samaniego and Mendez. The State responded that K.V.'s statement to Detective Samaniego was not being offered to prove the truth of the matter asserted in the statement, but rather, to put into context Mendez's own statements. The trial court overruled both objections, but it granted defense counsel's request to give a limiting instruction to the jury that K.V.'s statement was not being offered to prove that Mendez kicked I.V. but only to give context to law enforcement's investigation and interrogation.

The State subsequently published the entirety of the recorded interview between Detective Samaniego and Mendez, including a portion containing the following colloquy:

Det. Samaniego: Where did you hit him?

36

Mendez: Well, in the buttocks and then I hit him on. . . on the foot, you know. . .

Det. Samaniego: Where else?

Mendez: That's it.

Det. Samaniego: You didn't hit him in the . . . the body?

Mendez: She is telling me that, she was told that I kicked him, but why am I going to kick him?

Det. Samaniego: I think [K.V.] said that.

Mendez: Yeah, well . . .

Det. Samaniego: [K.V.]. The four year old.

Mendez: Um-hum.

Det. Samaniego: She said you kicked him. So I don't know if [K.V.] told her dad [sic] at the scene . . . I don't know.

Mendez: *(Nods Yes)*

. . .

Mendez: No. What she told me the . . . the . . . you know, the detectives told her that . . . they . . . they . . . that I kicked him.

Det. Samaniego: Yeah, but that's where we got the information from.

Mendez: Ok.

Det. Samaniego: From [K.V.].

Mendez: Well, the way I [unintelligible].

Det. Samaniego: You kicked him?

Mendez: No.

Detective Samaniego then questioned Mendez on the source of I.V.'s bruises, cuts, and bumps, and when he asked Mendez whether he had stomped on I.V. or hit him on the head, Mendez

37

denied it and claimed that I.V. had sustained his injuries by falling off a bed mattress. Detective Samaniego expressed his disbelief at Mendez's explanation, noting that "[I.V. had] bruises all over his body[.]" Mendez replied, "Yeah. He is a kid." When Detective Samaniego again confronted Mendez with K.V.'s statement, Mendez replied, "Ok. If that's what she says, then . . . ." When Detective Samaniego asked Mendez if he kicked I.V., Mendez replied that he "already told [Detective Samaniego] no" and expressed his frustration that investigators only "want to hear it [their] way." When Detective Samaniego confronted Mendez again with K.V.'s statement, Mendez stated that he was telling the truth, expressed his frustration again, and terminated the interview a short time later.

## Hearsay

We review the trial court's admission of evidence under the same abuse of discretion standard set forth above. *Knight v. State*, 457 S.W.3d 192, 201 (Tex. App.—El Paso 2015, pet. ref'd) (citing *Montgomery*, 810 S.W.2d at 391). Hearsay is a statement not made by the declarant while testifying at the trial or hearing, offered to prove the truth of the matter asserted in the statement. TEX. R. EVID. 801(d). Statements not offered to prove the truth of the matter asserted in the statement, but rather for some other purpose, are not hearsay and are admissible subject to other rules of evidence. *Jones*, 843 S.W.2d at 499. Out-of-court statements made by police officers during an interview with a witness are not hearsay "if they are offered only to give context to the interviewee's replies, even if the officers accuse the interviewee of lying and refer to the statements of unnamed witnesses." *McNeil*, 452 S.W.3d at 419 (quoting *Hernandez v. State*, No. 01-08-00306-CR, 2009 WL 1331649, at *6 –8 (Tex. App.—Houston [1st Dist.] May 14, 2009, pet. ref'd) (mem. op.) (not designated for publication). These kinds of statements offered to show

38

their effect on the listener are not hearsay. *Id*. (citing *Hernandez*, 2009 WL 1331649, at *6).

Thus, statements offered to show their effect on the listener or to give context to a police interview are not hearsay. *Id*.

On appeal, Mendez argues that K.V.'s statement to law enforcement that Mendez kicked I.V. was offered by the State to prove the truth of the matter asserted within the statement, i.e., that Mendez did in fact kick I.V. Further, Mendez asserts that the statement was not properly offered to give context to the interview because the content and credibility of Mendez's responses was not changed by the knowledge that K.V. had accused him of kicking I.V. The State responds that the inclusion of Detective Samaniego's references to K.V.'s statement allowed the jury to fully gauge Mendez's responses to her statement, and to place his statements during the interview into context. It cites *McNeil v. State*, 452 S.W.3d 408, 419 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd), for the proposition that the admission of interviewers' references to out-of-court statements not offered to prove the truth of the matter asserted, but rather to probe the interviewee into providing more accurate information, does not violate the hearsay rule. We find that the trial court did not abuse its discretion by admitting Detective Samaniego's references to K.V.'s out-of-court statement that Mendez kicked I.V. The statement was admissible to show the effect it had on Mendez when he was confronted with the accusation, and was designed to probe Mendez into providing more accurate information about what had happened to I.V., especially given the disconnect between the severity of I.V.'s injuries and Mendez's explanations for how they were sustained. Likewise, had Detective Samaniego's references to K.V.'s statement been redacted, Mendez's responses would have been rendered nonsensical and incoherent. As such, K.V.'s out-of-court statement did not constitute hearsay because it was not offered to prove the truth of the

39

matter asserted, and the trial court did not abuse its discretion in admitting it. *See id.* (officers'

reference to out-of-court documents did not constitute hearsay because they were not offered for

the truth of the matter asserted, but rather to probe the defendant into providing more accurate

information explaining the inconsistencies between his version of events and the victim's injuries,

and to show the statement's effect on the defendant); *Hernandez*, 2009 WL 1331649, at *6–7

(redaction of references to out-of-court statement would have rendered defendant's responses

during an interview incoherent, and were properly offered to provide context to the interview and

to show the out-of-court statement's effect on the defendant); *Kirk v. State*, 199 S.W.3d 467, 479

(Tex. App.—Fort Worth 2006, pet. ref'd) (out-of-court statement offered to give context to

defendant's replies during police interview was not hearsay, and redaction of statements would

have rendered interview incoherent); *Calderon v. State*, No. 08-09-00315-CR, 2011 WL 1734068,

at *1–3, 5 (Tex. App.—El Paso May 4, 2011, pet. ref'd) (not designated for publication) (officer's

references to out-of-court statements were not offered to prove truth of the matter asserted, but

rather to give context to the defendant's replies, and thus did not constitute hearsay).

### Unfair Prejudice

Mendez also contends that K.V.'s out-of-court statement that Mendez kicked I.V. was unfairly

prejudicial, and its admission violated Rule 403. Relevant evidence may nonetheless be

inadmissible where its probative value is outweighed by the risk of unfair prejudice. TEX. R.

EVID. 403. Rule 403 favors the admission of evidence and presumes that relevant evidence is

more probative than prejudicial. *Shuffield v. State*, 189 S.W.3d 782, 787 (Tex. Crim. App. 2006).

In determining whether a trial court violated Rule 403 by the admission of evidence, we balance

the following factors: (1) the inherent probative value of the evidence and (2) the State's need for

the evidence, against any tendency of the evidence to (3) suggest a decision on an improper basis, (4) confuse or distract the jury from the main issues, (5) be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or be needlessly cumulative. *Gigliobianco v. State*, 210 S.W.3d 637, 641–42 (Tex. Crim. App. 2006).

Here, the references to K.V.'s statement were probative because it showed his responses to being confronted with her statement. The State had a need for the admission of references to K.V.'s statement because they provided context to Mendez's interview with Detective Samaniego; without the references, Mendez's responses to Detective Samaniego's questions would have been rendered incoherent. On the other hand, the references to K.V.'s statement was not overly long and did not consume an inordinate amount of time to present, and the admission of the references to the statement did not pose a risk of allowing the jury to make a decision on an improper basis, of distracting the jury from the issues, or being given undue weight, especially in light of the trial court's limiting instruction to the jury prior to the publishing of the interview. Given the foregoing, and the presumption that relevant evidence is more probative than prejudicial, we conclude that the trial court did not abuse its discretion in admitting the references to K.V.'s statement, such that its decision was outside the zone of reasonable disagreement. Issue Five is overruled.

### Admission of Extraneous Offense Evidence

Finally, Mendez raises two issues involving admission of extraneous offense evidence. In Issue Six, Mendez argues that the trial court abused its discretion by admitting evidence of uncharged crimes, wrongs or bad acts, involving children other than I.V., the alleged victim.

41

Similarly, in Issue Seven, Mendez argues the trial court abused its discretion by admitting his prior conviction for aggravated assault with a deadly weapon. Mendez contends that, contrary to the State's argument below and on appeal, the defense did not "open the door" to admission of either complained-of extraneous offense evidence.

**Trial Events**

Before trial, the defense filed a written motion in limine to require the State to approach the bench before offering any testimony or other evidence of extraneous offenses, including acts of violence allegedly committed by Mendez against I.V.'s older siblings, J.R. and K.V. Mendez asserts that soon after the State called Villanueva as a witness, the prosecutor elicited testimony from her on direct examination that she "had never seen [Mendez] be physically violent with [her children]." Villanueva's response came after she was asked whether she had concerns about Mendez's treatment of her children at the time she moved out of her own mother's house to move in with him and his mother. Then, asking a series of questions, the State questioned Villanueva about whether she ever saw Mendez hit or kick I.V., whether she saw him take food away from I.V. as punishment, and whether I.V. was afraid of Mendez. To each question respectively, Villanueva responded, "No[,]" "No, ma'am[,]" and "To my knowledge, no."

From this testimony, Mendez argues that the State tried to minimize Villanueva's responsibility for the death of I.V., and instead, suggested "that her love for Ever Mendez had blinded her to his mistreatment of her children." On appeal, Mendez argues that defense counsel sought to expose the implausibility of the State's inference while cross-examining Villanueva. In this endeavor, defense counsel elicited testimony from Villanueva that she never saw any injuries on her children or heard complaints from them about being hurt by Mendez. Defense counsel

42

asked, "And you didn't observe on them, day-to-day, any injuries? They weren't bleeding?" Villanueva responded, "No."

At that point, the State asked to approach the bench, and during a conference outside the presence of the jury, the prosecutor argued that the defense had opened the door to Mendez's extraneous offenses and bad acts committed against J.R. and K.V. by eliciting testimony that Villanueva had never seen any of her children hurt or bleeding. The prosecutor argued that the defense had "opened the door to the priors of all children" and misled the jury by "painting a picture that the defendant has not abused all the children." Ruling in favor of the prosecution, the trial court agreed that the question, "And you didn't observe on them, day-to-day, any injuries? They weren't bleeding?" and Villanueva's response that she had not, qualified as opening the door to the admission of extraneous evidence involving abusive treatment of J.R. and K.V.

Shortly thereafter, defense counsel also elicited testimony from Villanueva that she did not believe Mendez had been capable of hitting her children. Defense counsel further asked, "[w]hen you say a person like [Mendez] is not capable of hitting the kids, what exactly do you mean by that?" Villanueva responded that she had questioned Mendez about his discipline asking "did we really have to go that far? Did we have to still keep on doing discipline?" She then explained he told her that he knew what he was doing, and he was not going to hurt "one of [her] kids." Defense counsel further asked whether she understood Mendez to mean that "it's not in [his] nature to hurt a child badly," to which Villanueva responded that that was what she thought was true of Mendez because she had not seen evidence to the contrary to that point.

The State then asked to approach the bench again and announced its intent to introduce evidence regarding Mendez's prior conviction for aggravated assault with a deadly weapon to

correct the impression left on the jury by Villanueva's statement that "it's not in [Mendez's] nature to be a violent person[.]"   Defense counsel responded that he was solely inquiring about her own belief but not suggesting otherwise about Mendez.   Ruling for the State, the trial court agreed it would allow the State to ask Villanueva whether she had personal knowledge of Mendez having been previously convicted of aggravated assault with a deadly weapon.

Later, on redirect, when the State asked Villanueva whether she was aware of Mendez's conviction of aggravated assault with a deadly weapon, Villanueva responded, "No, ma'am." Villanueva also admitted that, on one occasion, J.R. had sustained a cut to his forehead after Mendez had disciplined him.   J.R.'s cut remained visible in a photograph taken of him on the day that I.V. died.   Villanueva testified that when she asked Mendez whether she should take J.R. to the hospital for treatment of the injury, Mendez replied that she was "trying to baby [her] kids" and that she would look "ridiculous" for taking her child in for a cut.

The State subsequently called Villanueva's children, J.R. and K.V., to describe treatment they received from Mendez.   J.R., who was then twelve years old, described several incidents of physical and emotional abuse by Mendez that he experienced himself or witnessed against others. J.R. stated that the scar on his forehead resulted from an incident in which Mendez had put him in a time out, and when he fell to the floor, Mendez pulled him up from the floor then slammed a door on him.   In total, J.R. testified that Mendez had previously hit him with a belt, with his fist, and one time, even pointed a firearm at him.   Additionally, as to I.V., J.R. testified he saw Mendez hit and kick him on multiple occasions and touched his "private parts."   In addition to J.R.'s testimony, the State also elicited testimony from K.V. about abusive treatment by Mendez against her and her brothers.   When asked whether Mendez was "nice, mean, or something else to you,"

44

K.V. described him as mean. Elaborating, she testified he had hit her "[a]ll over [her] body" with a belt, "made us all night sit on the wall," and left her with a bruise visible on her neck the day she gave her interview at the CAC.

*Applicable Law and Analysis*

Evidence of other crimes, wrongs, or acts is inadmissible to prove that a defendant acted in accordance with his character on a particular occasion. TEX. R. EVID. 404(b)(1). Nevertheless, evidence of extraneous offenses or bad acts may be admissible to prove, *inter alia*, motive, knowledge, identity, or absence of mistake or accident, or to rebut a defensive theory. *Id*. 404(b)(2). Character evidence, even if inadmissible, may nevertheless be admissible if a party "opens the door" to such evidence by bringing forth matters via his questioning of a witness in a manner inviting the opposing party to respond. *See Daggett v. State*, 187 S.W.3d 444, 452 (Tex. Crim. App. 2005). For instance, if the defense elicits testimony regarding a blanket statement of good conduct or character—e.g., that the defendant would never engage in a particular criminal act—he may open the door to the admission of otherwise inadmissible evidence to rebut the false impression left on the jury regarding a relevant act or character trait. *Id*. Admission of extraneous offense evidence is reviewed under the same abuse of discretion standard set forth above. *Knight*, 457 S.W.3d at 201–02 (citing *De La Paz v. State*, 279 S.W.3d 336, 343-44 (Tex. Crim. App. 2009)).

On appeal, Mendez argues that he did not open the door to the admission of the complained-of extraneous offenses through his cross-examination of Villanueva because he was responding to an impression created by the State that Villanueva remained blameless in the death of her son by testifying she was unaware of any abuses committed by Mendez against her children.

45

He argues that he did not attempt to imply that Mendez had never abused the children himself or commit criminal acts against others in the past, but rather to establish that Villanueva was abusing the children and that she was responsible for I.V.'s death. The State counters that J.R.'s and K.V.'s testimony regarding Mendez's abuse toward them was admissible to rebut the impression left by Mendez's cross-examination of Villanueva that Mendez had not abused the children, that she did not believe he had been capable of hitting her children, and that he did not have an opportunity to abuse the children. The State also argues that J.R.'s and K.V.'s testimony was admissible to rebut the defensive theory that Mendez's disciplinary methods posed no risk of harm to the children and could not have possibly resulted in I.V.'s death.

On review, we find that the trial court did not abuse its discretion in admitting J.R.'s and K.V.'s testimony regarding Mendez's acts of abuse committed against them and I.V. Defense counsel's cross-examination of Villanueva elicited responses from her that Mendez "was not capable of hitting [her children]" and that it was "not in [his] nature to hurt a child badly," which created impressions that Mendez never struck or harmed her children, that he did not have an opportunity to abuse them, and that his character rendered him incapable of doing so. These impressions bolstered his defensive theories that he did not cause I.V.'s death because his character rendered him incapable of doing so, or he did not have the opportunity to commit the charged offense. Given these assertions, the State was therefore entitled to use J.R.'s and K.V.'s testimony to rebut these defensive theories by showing that Mendez did have an opportunity to commit the offense since he was often left alone with the children, he had abused them before, and his character did not prevent him from committing violent acts against children. *See* Tex. R. Evid. 404(b)(2); *see also Abshire v, State*, 62 S.W.3d 857, 861–62 (Tex. App.—Texarkana 2001, pet.

46

ref'd) (trial court did not abuse its discretion in admitting extraneous offense evidence offered to establish defendant's opportunity to commit the offense); *Patterson v. State*, No. 08-13-00111-CR, 2015 WL 181715, at *5 (Tex. App.—El Paso Jan. 14, 2015, pet. ref'd) (not designated for publication) (trial court properly admitted extraneous offense evidence which rebutted a defensive theory).   Further, Mendez's contention that he "did not intend" to open the door to the admission of extraneous offense evidence does not shield him from the admission of such evidence.  *See Harrison v. State*, 241 S.W.3d 23, 25 (Tex. Crim. App. 2007) (defense's unintentional elicitation of character testimony from defense witness nonetheless opened the door to the admission of defendant's prior assault convictions).

Likewise, the State was entitled to rebut Villanueva's opinion testimony regarding Mendez's character by use of his prior conviction for aggravated assault with a deadly weapon. The trial court did not err in finding that the defense opened the door to the admission of testimony regarding Mendez's prior conviction when it elicited testimony from Villanueva that "it's not in [Mendez's] nature to hurt a child badly." As such, the State's question on redirect examination regarding whether Villanueva was aware of Mendez's prior conviction was proper, and the testimony was admissible to rebut the false impression left by the defense's cross-examination of Villanueva.   *See* TEX. R. EVID. 404(a)(2)(A) (in a criminal case, a defendant may offer evidence of his pertinent trait, and the State may offer evidence to rebut it); *Harrison*, 241 S.W.3d at 25 (under TEX. R. EVID. 405(a)(1), the State may rebut a defendant's character-opinion evidence with "were you aware" questions about conduct inconsistent with the character trait brought into issue by the defendant).

In sum, the trial court did not abuse its discretion in admitting testimony from J.R. and

47

K.V. to rebut a false impression left on the jury about his character based on Mendez's cross-examination of Villanueva. The State offered the complained-of evidence to refute Mendez's defensive theories and to establish Mendez's opportunity to commit the offense. Likewise, the trial court did not err by allowing the State to ask Villanueva whether she was aware of Mendez's prior conviction for aggravated assault with a deadly weapon because the defense had opened the door to the admission of this testimony by leaving an impression with the jury that Mendez had been incapable of harming children by his nature. As such, the trial court's decision to admit the complained-of evidence did not fall outside the zone of reasonable disagreement. *See Bass v. State*, 270 S.W.3d 557, 563 (Tex. Crim. App. 2008) (trial court did not abuse its discretion in admitting extraneous offense evidence given the evidence made defensive theories less probable and was subject to reasonable disagreement); *Harrison*, 241 S.W.3d at 25. Issues Six and Seven are overruled.

## II.

Finally, although we note that the trial court certified Mendez's right to appeal in this case, the certification on record does not bear his signature indicating he was informed of his rights to appeal and to file a pro se petition for discretionary review with the Texas Court of Criminal Appeals. *See* TEX. R. APP. P. 25.2(d). We find the certification is defective and has yet to be corrected by Mendez's attorney or the trial court. To remedy this defect, this Court ORDERS Mendez's attorney, pursuant to TEX. R. APP. P. 48.4, to send Mendez a copy of this opinion and this Court's judgment, to notify Mendez of his right to file a pro se petition for discretionary review, and to inform Mendez of applicable deadlines. *See* TEX. R. APP. P. 48.4, 68. Mendez's attorney is further ORDERED to comply with all requirements of TEX. R. APP. P. 48.4.

48

## CONCLUSION

The trial court's judgment is affirmed as reformed.

GINA M. PALAFOX, Justice

April 17, 2019

Before Rodriguez, J., Palafox, J., and Larsen, J. (Senior Judge)
Larsen, J. (Senior Judge), sitting by assignment

(Do Not Publish)